1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

SKINMEDICA, INC.,

                                          Plaintiff,

          vs.

HISTOGEN INC.; HISTOGEN
AESTHETICS LLC; GAIL K. NAUGHTON,

                                          Defendants.

_____

AND RELATED COUNTERCLAIMS

CASE NO. 09-CV-122 JLS (NLS)

**ORDER: CONSTRUING
DISPUTED CLAIM TERMS OF
UNITED STATES PATENT NOS.
6,372,494 AND 7,118,746**

          Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), the Court conducted a hearing on February 15 and 16, 2011 regarding the construction of disputed claim terms in United States Patent Nos. 6,372,494 (the '494 patent) and 7,118,746 (the '746 patent).  Attorneys Stephen Swinton and Alexander Long appeared on behalf of Plaintiff SkinMedica, Inc.  Plaintiff's expert, Dr. Daniel Salomon, also testified at the hearing.  Attorneys Randall Kay, Lisa Haile, and Erin Gibson appeared on behalf of Defendants Histogen Inc., Histogen Aesthetics LLC, and Gail K. Naughton (collectively, Histogen).  Upon careful consideration of the papers and counsel's oral arguments, the Court issues the following Order construing the disputed claim terms of the patents at issue in this case.

//

//

**BACKGROUND**

On January 22, 2009, SkinMedica filed this action alleging, *inter alia*, infringement of the '494 and '746 patents.  (Doc. No. 1.)  SkinMedica's operative complaint asserts claims for patent infringement, misappropriation of trade secrets, unfair competition, breach of contract, and imposition of constructive trust.  (Doc. No. 31.)  Histogen has filed counterclaims for a declaration of patent non-infringement and unfair competition.  (Doc. No. 35.)  And each side asserts various affirmative defenses to the other's claims.  (*Id.*; Doc. No. 40.)

Generally, the '494 and '746 patents "describe and encompass 'novel conditioned cell culture medium compositions' and 'uses for these novel compositions.'"  (Doc. No. 44 (SkinMedica's Claim Construction Brief (CCB)), at 9 (citing '494 Patent col.4 ll.40–44); *accord* Doc. No. 48 (Histogen's Responsive CCB), at 3 ("[T]he claims of the Asserted Patents are directed toward methods of making conditioned medium using a three-dimensional culture system . . . .").)  "Cell culture medium is the liquid solution used to 'culture,' or, 'grow' cells *in vitro*, and typically includes various raw materials—*e.g.*, amino acids, vitamins, sugars, etc.—that the cells need to grow and expand in number."  (SkinMedica's CCB 9 (citing '494 Patent col.1 ll.21–26).)  "Once the culture medium is incubated with cells, it becomes a 'spent' or 'conditioned' medium."  (*Id.* (citing '494 Patent col.1 ll.30–32).)

"The '494 and '746 patents are specifically directed to conditioned medium derived from cells cultured in three-dimensions."  (*Id.*)  Cells cultured in three dimensions "express an extracellular matrix of proteins, thus forming a living tissue."  (*Id.* (citing '494 Patent col.6 ll.54–56).)  Further, cells cultured in three dimensions secrete growth factors and other proteins in ratios higher than cells cultured in two-dimensional monolayers.  (*Id.* (citing '494 Patent col.5 ll.1–4, col.6 ll.9–17).)  Thus, conditioned medium derived from cells grown in three dimensions is superior to conditioned medium derived from cells grown in two dimensions.  (*See id.*)

The independent claims of the '494 patent recite a method of making a composition, comprising "culturing fibroblast cells in three-dimensions . . . so that a conditioned medium is formed," "removing the conditioned medium from the cultured cells," and "combining the conditioned medium with a pharmaceutically acceptable carrier."  '494 Patent col.32 ll.10–19, 33–49.  The single

1    independent claim of the '746 patent recites "[a] method of reducing deleterious effects to

2    keratinocytes," comprising "administering to the keratinocytes a composition comprising conditioned

3    cell medium that has previously supported the growth of mesenchymal cells cultured in three-

4    dimensions on a non-living support . . . thereby reducing intracellular oxidation in the keratinocytes."

5    '746 Patent col.40 ll.7–18.

6                                    **LEGAL STANDARD**

7            The Court construes the scope and meaning of disputed patent claims as a matter of law.

8    *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388–90 (1996).  Words of a claim are

9    "generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90

10   F.3d 1576, 1582 (Fed. Cir. 1996).  This is the meaning the term would have to a person of ordinary

11   skill in the art as of the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d

12   1303, 1313 (Fed. Cir. 2005).  Because the inquiry into the meaning of claim terms is an objective one,

13   the court looks to publicly available sources to show what a person would have understood the claim

14   language to mean. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116

15   (Fed. Cir. 2004).  Those sources include the claims, the specification, the prosecution history, and

16   relevant extrinsic evidence. *Id.*

17          Claim construction begins with an analysis of the words of the claims themselves. *See Scanner

18   Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004).  In examining the

19   claims, "the context in which a term is used can be highly instructive." *Phillips*, 415 F.3d at 1314.

20   Moreover, "[o]ther claims of the patent in question, both asserted and unasserted can . . . be valuable

21   sources of enlightenment as to the meaning of a claim term." *Id.*  "Because claim terms are normally

22   used consistently throughout the patent, the usage of a term in one claim can often illuminate the

23   meaning of the same term in other claims." *Id.*  Conversely, under the doctrine of claim

24   differentiation, "'different words or phrases used in separate claims are presumed to indicate that the

25   claims have different meanings and scope.'" *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d

26   1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968,

27   971–72 (Fed. Cir. 1999)).

28          "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only

                                              - 3 -

in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582; accord Phillips, 415 F.3d at 1317.  The specification acts as a dictionary when it expressly or implicitly defines terms used in the claims. *Vitronics*, 90 F.3d at 1582.  In doing so, the patentee may define a claim term in a manner inconsistent with its ordinary meaning. *Metabolite Labs., Inc. v. Lab. Corp. of Am.*, 370 F.3d 1354, 1360 (Fed. Cir. 2004).

Patent claims ordinarily should be construed to encompass the preferred embodiments described in the specification, for "[a] claim construction that excludes a preferred embodiment . . . 'is rarely, if ever correct.'" *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).  However, a court should not import limitations from the specification into the claims, *Phillips*, 415 F.3d at 1323, absent a specific reference in the claims themselves, *Reinshaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

The prosecution history may also inform claim construction. *Vitronics*, 90 F.3d at 1582. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.  It can be useful to show "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583.  But this is not a rule of admissibility, nor does it "prohibit courts from examining extrinsic evidence, even where the patent document is itself clear." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).  The court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324.

//

//

- 4 -

1    **CONSTRUCTION**

2        The '494 and '746 patents descend from the same application, and have similar specifications

3    and claims.  (*See* Histogen's Responsive CCB 3 ("The '746 patent is a continuation-in-part of the '494

4    patent . . . ."); '746 Patent, at [63].)  Accordingly, the Court construes the patents together.

5        The parties dispute the meaning of over a dozen claim terms.  (*See generally* Doc. No. 33

6    (Joint Claim Construction Chart).)  However, because several of the disputed terms "are either

7    identical or substantially the same across the two patents," the parties agree that "the Court need only

8    address eight collective arguments."[1]  (SkinMedica's CCB 11; *see* Histogen's Responsive CCB 8–23

9    (adopting SkinMedica's grouping of terms).)  The Court addresses each argument in turn.

10   **1.     Dr. Salomon's Testimony**

11       At the threshold, the Court notes that it admitted Dr. Salomon's testimony as to the meaning

12   of the disputed claim terms over Defendants' objection.  (*See* Doc. Nos. 146–147 (CC Hr'g Tr.), at

13   82–151; Doc. No. 140 (Order Overruling Defendants' Objections to Extrinsic Evidence).)  Upon

14   exhaustive review, however, the Court concludes that the intrinsic evidence of the disputed terms'

15   meanings generally provides a sufficient basis from which to construe the terms.  Accordingly, the

16   Court declines to rely on Dr. Salomon's testimony except as specifically stated herein, where it is

17   consistent with the intrinsic patent record.  *See Vitronics*, 90 F.3d at 1584.

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27

28       [1] As noted *infra*, the parties reached agreements on two groups of claim terms at the hearing.
     Accordingly, only six of the eight collective arguments are addressed in this Order.

2.     "culturing . . . cells in three-dimensions"

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction[2] |
|---|---|---|
| "culturing fibroblast cells in three-dimensions" | Plain meaning, or "growing fibroblast cells in three dimensions" | "growing fibroblast cells on a structure forming a porous framework (as opposed to monolayers or beads) wherein the cells proliferate both on the surface of and into the pores of the framework, forming a three dimensional tissue" |
| "cultured in three-dimensions" | Plain meaning or "grown in three dimensions" | "growing cells on a structure forming a porous framework (as opposed to monolayers or beads) wherein the cells proliferate both on the surface of and into the pores of the framework, forming a three dimensional tissue" |
| "culturing mesenchymal cells in three-dimensions" | Plain meaning or "growing mesenchymal cells in three dimensions" | "growing mesenchymal cells on a structure forming a porous framework (as opposed to monolayers or beads) wherein the cells proliferate both on the surface of and into the pores of the framework, forming a three dimensional tissue" |

The term "culturing . . . cells in three-dimensions" is repeated in substantially the same form in claims 1 and 8 of the '494 patent, and claims 1 and 11 of the '746 patent. (Histogen's Responsive CCB 8.) "[T]he parties have agreed that this term has a common meaning across its various incarnations . . . ." (SkinMedica's CCB 12.) "The only difference is the scope of the tissue specific cells that are part of the culture . . . ." (Histogen's Responsive CCB 8.)

The parties agree that "'culturing' means 'growing' and that the terms 'three-dimensions' or 'three-dimensional' require no further elaboration or clarification." (SkinMedica's CCB 12.) Accordingly, the Court need only determine whether the inventors further limited the invention to

_____

[2] Histogen modified some of its proposed constructions at the hearing. (*See* CC Hr'g Tr.194 ("Mr. Kay: . . . And I'm going to make a concession. Take the words "mesh or," "mesh or" and take them out of Histogen's proposed construction.").) The tables throughout this Order take Histogen's modifications into account.

1   specific embodiments described in the specification.  (*See, e.g.*, Doc. No. 43 (Histogen's CCB), at 6

2   ("[T]he claim construction issue for the Court's determination is what conditions, including structures,

3   are encompassed by 'culturing . . . in three-dimensions' within the meaning of the [asserted]

4   patent[s].").)

5        SkinMedica contends that "culturing . . . cells in three-dimensions" "has a plain meaning to

6   a person of ordinary skill in the art taken in light of the patent record" (SkinMedica's CCB 12 (citing

7   Doc. No. 44-1 (Salomon Decl. ISO SkinMedica's CCB) ¶ 16)) and encompasses any method of

8   culturing cells known in the art (*id.* (citing '494 Patent col.9 l.66 to col.10 l.2)).  According to

9   SkinMedica, "culturing in three-dimensions" "does not involve any special structural or other

10  functional features."  (*Id.*)

11       Histogen seeks to narrow SkinMedica's proposed construction in two respects.  The Court

12  addresses each in turn.

### A.    *"(as opposed to monolayers or beads)"*

14       First, Histogen contends that the inventors acted as their own lexicographers by "clearly and

15  unambiguously defining 'culturing . . . in three-dimensions'" to exclude "culturing 'in monolayer' or

16  on 'beads (i.e. in two-dimensions).'"  (Histogen's CCB 6; *accord id.* at 21–22.)  According to

17  Histogen, "[t]hroughout the specification[s], the . . . inventors consistently distinguish their invention

18  of culturing cells in three-dimensions from growing cells in monolayer or on beads, which was

19  explicitly carved out from their claimed invention . . . ."  (Histogen's CCB 7; *accord id.* at 22.)  "In

20  <u>every</u> instance in which culturing cells on beads is described in the Asserted Patents' specifications,

21  it its defined as culturing in two-dimensions and beads are distinguished from three-dimensional

22  culture."  (Histogen's Responsive CCB 9 (emphasis in original).)

23       The specifications contain four relevant references to beads:

24            (1)    "Cell lines grown as a monolayer or on beads, *as opposed to cells
        grown in three-dimensions*, lack the cell–cell and cell–matrix interactions
25      characteristic of whole tissue in vivo," '494 Patent col.1 ll.37–40 (emphasis added);

26            (2)    "Conventional conditioned cell culture medium, *medium cultured by
        cell-lines grown as a monolayer or on beads*, is usually discarded or occasionally used
27      in culture manipulations such as reducing cell densities," '494 Patent col.1 ll.44–47
        (emphasis added);

28            (3)    "The cells are cultured in monolayer, *beads (i.e., two-dimensions)* or,

- 7 -                                                      09cv122

preferably, in three-dimensions," '494 Patent col.7 ll.28–29 (emphasis added); and

(4)    "The cells may be cultured in any manner known in the art including in monolayer, beads[,] or in three-dimensions and by any means (i.e., culture dish, roller bottle, a continuous flow system, etc.)," '494 Patent col.9 l.66 to col.10 l.2.[3]

From these references, Histogen concludes that the inventors defined culturing on beads as culturing in two dimensions. (Histogen's CCB 7–8; Histogen's Responsive CCB 10 ("The many phrases distinguishing and defining culturing on beads as culturing in two-dimensions 'as opposed to' culturing in three-dimensions were added to the '494 and '746 patent specifications, and should be given meaning.").) Accordingly, "[t]he intrinsic record compels a construction of 'culturing . . . in three dimensions' to require culturing . . . cells using a framework or structure other than . . . using beads." (Histogen's CCB 8.)

SkinMedica responds that nothing in the patent record "evidences a clear and unmistakable intention to narrow the plain language of 'culturing . . . cells in three-dimensions' to exclude the use of microcarrier beads in three dimensions." (SkinMedica's Responsive CCB 3.) SkinMedica points out that, during the '494 patent's prosecution, the inventors overcame a rejection as anticipated over prior art "by clarifying that the invention was directed to a conditioned medium derived from a cell culture grown in three-dimensions, as opposed to the monolayer (*i.e.*, two-dimensional) cell culture" disclosed in the prior art. (*Id.* (citing *id.* Ex. 24, at 25).) But aside from "specifying that the cell culture used to condition the medium of the claimed invention must be three-dimensional," the inventors did not describe any "particular conditions, including structures" as either mandatory or outside the scope of the invention. (*Id.* at 4.)

Further, although SkinMedica concedes that the specification distinguishes "cells . . . cultured in three-dimensions" from cells grown in two dimensions "*using* beads," SkinMedica contends that "this is not the same as *defining* 'beads' used as the three-dimensional framework to be a two-dimensional cell culture." (*Id.* at 5 (emphasis in original).) According to SkinMedica, Histogen confuses "the *composition* of the framework with the *dimensionality* of the cell culture." (*Id.* (emphasis in original).) Thus, to adopt Histogen's proposed construction would contradict the broad

---

[3] The '746 patent's specification contains the same four references. '746 Patent col.1 ll.45–48, col.1 ll.52–55, col.8 ll.14–15, col.10 ll.55–58.

definition of "three-dimensional framework" in the patents' specifications[4] and the understanding of persons of ordinary skill in the art.  (*Id.* (citing, *inter alia*, Salomon Decl. ISO SkinMedica's CCB ¶¶ 11–12).)

Finally, SkinMedica contends that its proposed construction, which would include the use of beads, comports with the intrinsic patent record.  (*Id.*)  Specifically, *Cell & Tissue Culture: Laboratory Procedures*, which SkinMedica contends is incorporated into the patents by reference in its entirety, *see* '494 Patent col.7 ll.50–52; *id.* col.10 ll 2–4, describes how beads may be used to culture cells in three dimensions:

> A common occurrence in microcarrier culture is the formation of large microcarrier aggregates in which the microcarriers are joined by cellular bridges.  Microcarrier aggregates made up of as many as 10 or more microcarriers are not uncommon. . . . In certain cases, such as to promote bead-to-bead transfer of cells to bare microcarriers, low agitation rates would be desirable during the culture growth phase.

A. DOYLE ET AL., CELL & TISSUE CULTURE: LABORATORY PROCEDURES 8D:2.7 (1996), *available at* SkinMedica's CCB Ex. 7.  Thus, according to SkinMedica, "culturing . . . cells in three-dimensions" is just as amenable to SkinMedica's proposed construction as it is to Histogen's, and there is not enough "clarity, deliberateness, and precision" in the reference "beads (i.e., two-dimensions)" to *equate* the term "beads" with "two-dimensions."  (SkinMedica's Responsive CCB 7 (quoting *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005)).)

The Court agrees with Histogen that the inventors acted as their own lexicographers, defining "culturing . . . cells in three-dimensions" away from its ordinary meaning.  In three of the four instances in which the specification mentions beads, the inventors distinguished culturing on beads from culturing in three dimensions by using the disjunctives "or" (*see* '494 Patent col.7 ll.28–29; *id.* col.9 l.66 to col.10 l.2) and "as opposed to" (*id.* col.1 ll.37–40).  The fourth reference to beads defines medium cultured by cells grown on beads as "[c]onventional conditioned cell culture medium" and unequivocally teaches away from culturing on beads to create the claimed conditioned medium.  (*Id.* col.1 ll.44–47 (stating that medium cultured by cells grown on beads is "usually discarded" or

---

[4]  The patents' specifications define "three-dimensional framework" to mean "a three-dimensional scaffold composed of any material and/or shape that (a) allows cells to attach to it (or can be modified to allow cells to attach to it); and (b) allows cells to grow in more than one layer. . . . The structure of the framework can include a mesh, a sponge[,] or can be formed into a hydrogel."  '494 Patent col.6 ll.40–47; '746 Patent col.6 ll.48–55.

"occasionally used in culture manipulations such as reducing cell densities").)  By consistently distinguishing culturing on beads from culturing in three dimensions, the inventors defined "culturing . . . cells in three-dimensions" by implication to exclude culturing on beads.  *See Bell Atl. Network Servs. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) ("[W]hen a patentee uses a claim term throughout the entire specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" (quoting *Vitronics*, 90 F.3d at 1582)).

That the inventors explicitly defined beads as a two-dimensional culture method further bolsters the Court's conclusion.  Specifically, the phrase "beads (i.e., two-dimensions)" explicitly defines beads as a two-dimensional culture method, despite that culturing cells in three dimensions on beads was known in the art at the time the patent was filed.  *See Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1327, 1330 (Fed. Cir. 2003) (holding that specification explicitly defined the phrase "co-micronization of fenofibrate and a solid surfactant" by including the phrase "co-micronization of fenofibrate and a solid surfactant (*i.e., the micronization of an intimate mixture of fenofibrate and a solid surfactant*)" (emphasis added)).

The Court would reach a different conclusion if the intrinsic evidence disclosed even a single reference to culturing cells in three dimensions using beads.  *See, e.g.*, *Pfizer, Inc. v. Teva Pharm, USA, Inc.*, 429 F.3d 1364, 1373–74 (Fed. Cir. 2005) (holding that specification did not explicitly define term "saccharides" by including the phrase "saccharides (i.e., sugars)" because specification indicated that a broader construction was appropriate).  But contrary to SkinMedica's contention, the Court concludes that Doyle et al.—which SkinMedica relies on to support its construction—is not incorporated into the patents by reference in its entirety.

"When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the hose document as if it were explicitly contained therein." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001).  "To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  "Whether and to what extent material has been incorporated by reference into a host document is a

1    question of law." *Id.*

2            Under this standard, a general reference to a voluminous publication is not sufficient to

3    incorporate by reference a specific portion of a host document.  *See Commonwealth Scientific &*

4    *Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1372 (Fed. Cir. 2008) (holding that

5    footnote citation to article did not constitute an incorporation by reference of "any or all" of the

6    material set forth in the article).  That is because such a reference does not identify with "detailed

7    particularity" what "specific material" it incorporates into the host document. *Advanced Display Sys.*,

8    212 F.3d at 1282.  Nor does a general reference indicate "where" that material is found in the allegedly

9    incorporated document.  *Id.*

10           Here, SkinMedica contends that Doyle et al. is incorporated by reference "in its entirety," and

11   thus, its discussion of beads as a three-dimensional culture method is part of the intrinsic patent

12   record.  (SkinMedica's Responsive CCB 7; *see* '494 Patent col.7 ll.42–52 ("Examples of cell media

13   include . . . other media formulations readily apparent to those skilled in the art, including those found

14   in . . . *Cell & Tissue Culture: Laboratory Procedures* . . . which [is] incorporated by reference herein

15   in [its] entirety."); *see also* '494 Patent col.10 ll.2–4 ("Methods of cell and tissue culturing are well

16   known in the art, and are described, for example, in *Cell & Tissue Culture: Laboratory Procedures*,

17   *supra* . . . .").)  However, there is nothing about the two references to Doyle et al. that appears to

18   constitute an incorporation by reference of its discussion of beads as a three-dimensional culture

19   method under the standard set forth in *Advanced Display Systems*.  Specifically, the references do not

20   identify the relevant discussion of culturing on beads with detailed particularity or indicate where it

21   is found.  Accordingly, because Doyle et al.'s discussion of beads as a three-dimensional culture

22   method is not incorporated into the patents by reference, the intrinsic patent record does not compel

23   a broader construction of "culturing . . . cells in three-dimensions."[5]

24   //

---

25          [5] Dr. Salomon testified that, based on his review of the patents, their prosecution histories, and
     his experience, that the term "culturing . . . cells in three-dimensions" did not exclude culturing on
26   beads.  (CC Hr'g Tr. 88–89.)  However, this testimony is inconsistent with the intrinsic patent record,
     viewed in light of controlling law.  Notably, Dr. Salomon erroneously relied on Doyle et al. in
27   rendering his opinion.  (*See* CC Hr'g Tr. 91–93.)  Accordingly, the Court affords no weight to Dr.
     Salomon's testimony as to the meaning of "culturing . . . cells in three-dimensions." *See Vitronics*,
28   90 F.3d at 1584.

1    **B.**     ***"a structure forming a porous framework . . . wherein the cells proliferate both on the***

2    ***surface of and into the pores of the framework, forming a three dimensional tissue"***

3         Second, Histogen contends that the inventors further defined what type of three-dimensional

4    frameworks could fall within the meaning of the '494 patent, namely, porous frameworks.  (Histogen's

5    CCB 8; Histogen's Responsive CCB 11 ("[A]ll references to the illustrative three-dimensional

6    framework in the specifications are to a mesh or other porous framework.").)  According to Histogen,

7    "[t]he three-dimensional structure must allow the cells to proliferate both on the surface and into the

8    pores of the framework, because . . . the living stromal tissue is formed when the cells 'substantially

9    envelop the framework.'"  (Histogen's CCB 9.)

10         SkinMedica responds that Histogen's proposed construction would inappropriately import

11    limitations from the specification into the claims.  (SkinMedica's CCB 12–14; SkinMedica's

12    Responsive CCB 7–9.)   According to SkinMedica, whereas Histogen's proposed construction

13    "suggests that use of a mesh or similar porous framework is *required*," the patents' specifications "are

14    explicit that such meshes are *exemplary only*."  (SkinMedica's CCB 13 (emphasis in original).)

15    Although the specifications state that "[t]he structure of the framework *can* include a mesh," '494

16    Patent col.6 ll.45–47 (emphasis added), they also make clear that "[a] number of different materials

17    may be used to form the framework," *id.* col.11 ll.57–59, and that those materials "may be woven[,]

18    braided, knitted, etc., into a mesh, *for example*, to form the tree-dimensional [sic] framework,"

19    *id.* col.12 ll.1–2.[6]

20         The Court finds that a porous framework limitation has no place the claims.  The Federal

21    Circuit has repeatedly held that "a narrow disclosure in the specification does not necessarily limit

22    broader claim language."  *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir.

23    _____

24         [6] SkinMedica also contends that Histogen's proposed construction would violate the doctrine
of claim differentiation, but this argument does not withstand close scrutiny.  (SkinMedica's CCB

25    12–13.)  Independent claim 1 of the '494 patent recites a method of culturing fibroblast cells in three
dimensions without reference to any supporting structure.  *See* '494 Patent col.32 ll.10–19.  In

26    contrast, dependent claim 8 recites a method of culturing the cells in three dimensions "on a
framework composed of a biocompatible, non-living material formed into a three-dimensional

27    structure."  As Histogen correctly notes, "[t]he framework recited by claim 8 is just one type of a
'mesh or other porous framework' within Histogen's proposed meaning of claim 1."  (Histogen's
Responsive CCB 12; *see* '494 Patent col.11 ll.54–66 (listing materials that may be used to form the

28    three-dimensional framework).)  Accordingly, Histogen's proposed construction does not result in
claims 1 and 8 having the same scope in violation of the doctrine of claim differentiation.

09cv122

2007) (citing *Phillips*, 415 F.3d at 1323).  Here, the overall context of the patents does not disavow the use of structures other than a mesh or porous framework.  The references Histogen cites (*see, e.g.*, Histogen's CCB 8–9 (citing, *inter alia*, '494 Patent col.10 ll.37–52)) do not expressly limit the entire invention but only describe a single embodiment.

Accordingly, the Court (1) **CONSTRUES** "culturing fibroblast cells in three-dimensions" to mean "**growing fibroblast cells in three dimensions (excluding growing fibroblast cells in monolayers or on microcarrier beads)**"; (2) **CONSTRUES** "cultured in three-dimensions" to mean "**grown in three dimensions (excluding grown in monolayers or on microcarrier beads)**"; and (3) **CONSTRUES** "culturing mesenchymal cells in three-dimensions" to mean "**growing mesenchymal cells in three dimensions (excluding growing mesenchymal cells in monolayers or on microcarrier beads)**."

**3.   "framework . . . formed into a three-dimensional structure"**

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction |
|---|---|---|
| "framework . . . formed into a three-dimensional structure" | Plain meaning, or "a three-dimensional structure composed of any material and/or shape that (a) allows cells to attach to it (or can be modified to allow cells to attach to it); and (b) allows cells to grow in more than one layer" | Framework: "a porous structure, porous support, or porous scaffold onto which cells are innoculated"<br><br>A three-dimensional structure: "a structure forming a mesh or porous framework (as opposed to monolayers or beads) wherein the cells proliferate both on the surface of and into the pores of the framework, forming three-dimensional tissue" |

The term "framework composed of a biocompatible, non-living material formed into a three-dimensional structure" appears in independent claim 8 of the '494 patent.  A slight variation of this term—"framework comprising a biocompatible, non-living material formed into a three-dimensional structure"—appears in dependent claims 6 and 19 of the '746 patent.  "However, the parties agree that this variation does not alter the construction of the term, and therefore the 'framework' terms of both patents may be construed together."  (SkinMedica's CCB 14 n.7.)

SkinMedica contends that the term "framework composed of a biocompatible, non-living

material formed into a three-dimensional structure" has a plain meaning that is understood by one of

skill in the art.  (SkinMedica's CCB 14.)  The specifications define "three-dimensional framework"

to mean "a three-dimensional scaffold composed of any material and/or shape that (a) allows cells to

attach to it (or can be modified to allow cells to attach to it); and (b) allows cells to grow in more than

one layer. . . . The structure of the framework can include a mesh, a sponge[,] or can be formed into

a hydrogel." '494 Patent col.6 ll.40–47; '746 Patent col.6 ll.48–55.  According to SkinMedica, "[t]his

definition makes clear that a 'framework composed of a biocompatible, non-living material formed

into a three-dimensional structure' may be of *any* material and/or shape; therefore, at most, the

definition suggests what the structure *can* include, not what it *must* include."  (SkinMedica's CCB 15

(emphasis in original).)

Citing its proposed construction of "culturing . . . in three dimensions," Histogen contends that

the inventors not only disclaimed growing cells on monolayers or beads, but also defined what three-

dimensional frameworks fall within the meaning of the patents.  (Histogen's CCB 16.)  According to

Histogen, during prosecution, the inventors "emphasized the importance of diffusion through the

framework to the claimed invention."  (Histogen's Responsive CCB 14 (citing Histogen's CCB Ex.

G, at 84–89; *id.* Ex. N, at 208 ("[A]bility to diffuse through the structure appear[s] to affect the level

of proteins found in the medium.")).)  "The inventors intended to show that a mesh or other porous

framework, onto which cells are inoculated, is required to distinguish from the prior art culture

systems resulting in conditioned medium."  (Histogen's CCB 16 (citing, *inter alia*, '494 Patent col.10

ll.49–52 ("Importantly, because openings in the mesh permit the exit of stromal cells in culture,

confluent stromal cells do not exhibit contact inhibition, and the stromal cells continue to grow,

divide, and remain functionally active.")).)

SkinMedica responds that the specifications demonstrate "that the use of a 'mesh or porous

framework' is only exemplary, rather than mandatory."  (SkinMedica's Responsive CCB 9.)  Further,

according to SkinMedica, the inclusion of the phrase "onto which cells are inoculated" in Histogen's

proposed construction has the effect of excluding "polymerized hydrogels" that are expressly

incorporated in the dependent claims as an alternate embodiment.  (*Id.*)  The patents contemplate that

hydrogels may "harden into a matrix" only after they are mixed with "large numbers of the desired

1   cell type." '494 Patent col.3 ll.20–22.  Thus, cells cannot be inoculated "onto" a polymerized

2   hydrogel.[7]

3          The Court declines Histogen's invitation to import limitations from the specification into the

4   claims.  First, there is nothing in the claims, the specification, or the prosecution history that limits the

5   framework to "a porous structure."  At most, "a porous structure" is an exemplary embodiment.  *See*

6   '494 Patent col.10 ll.49–52; *id.* col.11 l.66 to col.12 l.2 ("Any of these materials may be woven,

7   braided, knitted, etc., into a mesh, *for example*, to form the tree-dimensional [sic] framework.")

8   (emphasis added).  And as the Federal Circuit has made clear, the Court should not import a limitation

9   from a specification into the claims absent a specific textual reference in the claims themselves.

10  *Reinshaw*, 158 F.3d at 1248.

11          Second, Histogen's claim that the inventors distinguished their invention from the prior art

12  based on the capacity for diffusion through the framework lacks merit.  As discussed in greater detail

13  *infra*, the principal distinction that the inventors drew during prosecution was between culturing cells

14  in two dimensions and culturing cells in three dimensions.  (*See generally* Histogen's CCB Ex. N, at

15  175–76, 206–10.)  In fact, the portion of the prosecution history Histogen cites can be reasonably

16  interpreted to refer to capacity for diffusion through the *cell culture's* three-dimensional structure,

17  rather than the framework's.

18          Third, Histogen's proposed construction would exclude the use of frameworks composed of

19  polymerized hydrogels because cells cannot be inoculated "onto" a polymerized hydrogel.  Thus,

20  insofar as it calls for a structure "onto which cells are inoculated," Histogen's construction would

---

21

22          [7]  SkinMedica also contends that Histogen's proposed construction violates the doctrine of
    claim differentiation. (SkinMedica's CCB 15.)  As above, this argument lacks merit.  Independent
23  claim 9 of the '494 patent recites the method of independent claim 8, "wherein the three-dimensional
    framework comprises a mesh, sponge[,] or a polymerized hydrogel."  '494 Patent col.32 ll.49–51.
24  Dependent claim 20 of the '746 patent contains a similar limitation.  '746 Patent col.42 ll.8–10.
    According to SkinMedica, "[u]nder the doctrine of claim differentiation, the fact that the dependent
25  claims expressly limit the recited 'framework' to such specified structures confirms that the
    independent claims have a broader interpretation."  (SkinMedica's CCB 15.)  However, Histogen's
26  proposed construction of the independent claims would encompass the universe of structures "forming
    a porous framework," whereas dependent claim 9 of the '494 patent and dependent claim 20 of the
27  '746 patent limit the structure to a "a mesh, sponge[,] or a polymerized hydrogel."  '494 Patent col.32
    ll.49–51.  Thus, assuming that the universe of structures forming a mesh or porous framework
28  encompasses more than just meshes, sponges, and polymerized hydrogels, Histogen's proposed
    construction does not result in multiple claims having the same scope in violation of the doctrine of
    claim differentiation.

contravene the express language of dependent claim 9 of the '494 patent and dependent claim 19 of the '746 patent, which expressly incorporate polymerized hydrogels as an alternative embodiment.

Accordingly, the Court adopts SkinMedica's proposed construction and **CONSTRUES** "framework . . . formed into a three-dimensional structure" to mean "**a three-dimensional structure composed of any material and/or shape that (a) allows cells to attach to it (or can be modified to allow cells to attach to it); and (b) allows cells to grow in more than one layer**."

**4.    "substantially envelop" and "substantially enveloping"**

| Claim language | SkinMedica's proposed construction |
|---|---|
| "substantially enveloping" and "substantially envelop" | Plain meaning, or "substantially enclosing, surrounding or covering" |

The term "substantially enveloping" appears in claim 8 of the '494 patent, and the term "substantially envelop" appears in claims 6 and 19 of the '746 patent. The parties propose to give both terms the same construction. (*See* SkinMedica's CCB 16–17; Histogen's Responsive CCB 22–23.)

At the hearing, Histogen's counsel indicated that Histogen would agree to *either* plain meaning or SkinMedica's proposed construction. (CC Hr'g Tr. 281–82 ("The Court: So plain meaning or substantially enclosing, surrounding[,] or covereing.  You're okay either way? [¶] Mr. Kay: Correct.").)  In an abundance of caution, the Court adopts SkinMedica's proposed construction and **CONSTRUES** "substantially enveloping" and "substantially envelop" to mean "**substantially enclosing, surrounding, or covering**." *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'" (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)).

//
//
//
//
//

5.      "conditioned medium" and "conditioned cell medium"

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction |
|---|---|---|
| "conditioned medium" and "conditioned cell medium" | Plain meaning, or "a formulation containing extracellular protein(s) and cellular metabolites, which has previously supported the growth of cells having been cultured in three-dimensions" | "a formulation containing extracellular protein(s) and cellular metabolites, which has previously supported the growth of cells having been cultured on a three-dimensional porous framework under normoxic conditions" |

The term "conditioned medium" appears in independent claims 1 and 8 of the '494 patent, and dependent claim 11 of the '746 patent. The term "conditioned cell medium," appears in claims 1, 15, and 22 of the '746 patent, and the parties propose to construe it to have the same meaning as "conditioned medium."[8]   (*See* Joint Claim Construction Chart 6–14, 26–30, 43–46.)

SkinMedica argues that "conditioned medium" and "conditioned cell medium" have a plain meaning to those of ordinary skill in the art, and thus require no construction. (SkinMedica's CCB 17 (citing '494 patent col.1 ll.30–32).) SkinMedica's proposed alternative construction "comports with the express *definition*" of conditioned medium and conditioned cell medium contained in the patents' specifications. (*Id.* (emphasis in original).) Specifically, the patents commonly define "conditioned media" and "conditioned cell media" to mean "a formulation containing extracellular protein(s) and cellular metabolites, which has previously supported the growth of any desired eukaryotic cell type, said cells having been cultured in either two or three dimensions." '494 Patent col.6 ll.25–30; '746 Patent col.6 ll.33–38.

Histogen seeks to narrow SkinMedica's proposed alternative construction in two respects. The Court addresses each in turn.

*A.      "three-dimensional porous mesh framework"*

First, Histogen contends that the term only encompasses a conditioned medium "obtained from cells cultured on a three-dimensional porous structure." (Histogen's CCB 10.)   According to

---

[8] The patents themselves also use these terms interchangeably. *See* '494 Patent col.6 ll.25–30; '746 Patent col.6 ll.33–38.

09cv122

Histogen, the inventors of the '494 and '746 patents argued during the patents' prosecution that "the 'ability to diffuse through the three-dimensional structure' made a patentable difference in the conditioned medium." (Histogen's Responsive CCB 13.)

During the '494 patent's prosecution, inventor Jonathan Mansbridge, Ph.D., submitted a declaration to the PTO describing the differences between conditioned medium obtained from cells cultured in two dimensions and that obtained from cells cultured in three dimensions. (*See* Histogen's CCB Ex. G ¶¶ 7–10.) Dr. Mansbridge described the results of experiments on two conditioned media:

> These results demonstrate that the two conditioned media do not have the same composition and makeup factors and cytokines. Further, as described below, the level of factors secreted into the medium does not have direct correspondence to mRNA and protein production. Both protein processing steps and *ability to diffuse through the three-dimensional structure* appear to affect the levels of proteins found in the medium.

(*Id.* ¶ 7 (emphasis added).)

As SkinMedica points out, however, the principal distinction that Dr. Mansbridge drew was between conditioned medium obtained from cells cultured in two dimensions and that obtained from cells cultured in three dimensions. (SkinMedica's Responsive CCB 12.) During the prosecution of the '746 patent, the inventors summarized Dr. Mansbridge's declaration:

> The Declaration clearly demonstrates that the culturing of eukaryotic cells in three-dimensions results in the production of a conditioned medium having a different chemical composition and different biological activity than culture in two-dimensions and that these differences were unexpected and heretofore unknown prior to the filing of [the '494 application].

(Histogen's CCB Ex. N, at 176; *see also id.* Ex. G ¶ 10 ("This experiment demonstrates that the culturing of cells in three-dimensions results in the production of a conditioned medium that has an activity . . . that is different from the same cells cultured in two dimensions.").)

The Court rejects Histogen's attempt to limit the claims' reach to conditioned medium grown on a porous mesh framework. Dr. Mansbridge's declaration does not refer to the nature of the structure that the cells are cultured on. "Indeed, that declaration *does not even mention the words 'mesh' or 'porous framework.'*" (SkinMedica's Responsive CCB 12 (emphasis in original).) In fact, the only reference to "structure"—the italicized portion of the declaration—can be reasonably interpreted to refer to the ability to diffuse through the *cell culture's* three-dimensional structure, rather than the framework's. Thus, there is no basis for the argument that the inventors distinguished

their conditioned medium from the prior art based on the cell culture's ability to diffuse through a porous mesh framework.   Rather, it was the observed difference between conditioned medium obtained from cells cultured in two dimensions and that obtained from cells cultured in three dimensions that distinguished the claimed conditioned medium from the prior art.   (*See* Histogen's CCB Ex. N, at 175–76.)

**B.    *"under normoxic conditions"***

Second, Histogen contends that "the claimed 'conditioned medium' must be obtained from cells cultured under normoxic conditions."[9]   (Histogen's CCB 11.)   "Normoxic conditions were the commonly used tissue culture conditions at the time the '494 application was filed."  (*Id.*)   According to Histogen, other-than-normoxic conditions were "nascent technology" at the time the patent application was filed, and therefore, could not have been enabled without a specific textual reference.[10]   (*Id.* at 11-12; Histogen's Responsive CCB 13–14; *see Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) ("Nascent technology . . . must be enabled with a 'specific and useful teaching.'" (quoting *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1368 (Fed. Cir. 1997))).

SkinMedica disagrees that other-than-normoxic conditions were nascent technology at the time the patent application was filed.  (SkinMedica's Responsive CCB 13).  SkinMedica points out that "[t]he patent specifications themselves discuss cell cultures grown by persons of ordinary skill in the art not only in 'normoxic conditions,' but also in 'hypoxic conditions' (less than normal oxygen) at the time the '494 patent was filed."  (*Id.* (citing '494 Patent col.3 ll.45–51).)   Further, one publication cited on the face of the '494 patent specifically addresses the effect of hypoxic conditions on cell cultures used to model avascular solid tumor growth.  (*See id.* Ex. 26, at 91 ("The prevalence of hypoxic conditions in three-dimensional avascular solid tumour nodules will provide a strong selective force that will favour survival and proliferation of cells that are resistant to hypoxic stress.") (cited in '494 Patent, at [56]).)

---

[9]   "'Normoxic' is a term of art that means an atmospheric or air condition with an oxygen percentage of 20 percent or higher."  (Histogen's CCB 11.)

[10]   Notably, Histogen relies on extrinsic evidence in support of its contention that normoxic conditions were the commonly used tissue culture conditions at the time the '494 application was filed.  (*See* Histogen's CCB 11 (citing *id.* Ex. B, at 32; *id.* Ex. H, at 103).)

The Court agrees with SkinMedica.  The intrinsic evidence demonstrates that culturing cells under hypoxic conditions was known in the art at the time the patent application was filed.  Thus, no disclosure was required to enable the claims for culturing cells under normoxic *and* hypoxic conditions.  *See Chiron*, 363 F.3d at 1254 ("The law requires an enabling disclosure for nascent technology because a person of ordinary skill in the art has little or no knowledge independent from the patentee's instruction.").

Moreover, SkinMedica essentially proposes that the Court adopt the specification's definition verbatim, with the added limitation that the conditioned medium be obtained from cells cultured in three dimensions.  And "[w]here . . . the patentee has clearly defined a claim term, that definition '[u]sually . . . is dispositive; it is the single best guide to the meaning of a disputed term.'" *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002) (quoting *Vitronics*, 90 F.3d at 1582).  Histogen's arguments for a contrary construction attempt to stretch the specification and the prosecution history beyond their outer limits.

Accordingly, the Court adopts SkinMedica's proposed construction and **CONSTRUES** "conditioned medium" and "conditioned cell medium" to mean "**a formulation containing extracellular protein(s) and cellular metabolites, which has previously supported the growth of cells having been cultured in three-dimensions**."

**6.    "pharmaceutically acceptable carrier" and "pharmaceutical carrier"**

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction |
|---|---|---|
| "pharmaceutically acceptable carrier" and "pharmaceutical carrier" | Plain meaning, or "solid or liquid diluents or encapsulating substances that are suitable for administration to a human or lower animal" | "a  vehicle for internal administration" |

The term "pharmaceutically acceptable carrier" appears in independent claims 1 and 8 of the '494 patent, and the term "pharmaceutical carrier" appears in dependent claims 2 and 11 of the '746 patent. "Although differing in phrasing, the parties agree that 'pharmaceutically acceptable carrier and 'pharmaceutical carrier' have a common meaning in the context of the '494 and '746 patents." (SkinMedica's CCB 18; *see* Histogen's Responsive CCB 15–18.)

SkinMedica contends that "the plain language of the claims, the specification[s], and the prosecution histories of the patents" all show that "pharmaceutically acceptable carrier" and "pharmaceutical carrier" should be given their plain meaning as understood by persons of ordinary skill in the art. (SkinMedica's CCB 18; *see also* Salomon Decl. ISO SkinMedica's CCB ¶ 20 (defining "pharmaceutically acceptable carrier," as understood by a person of ordinary skill in the art and citing extrinsic prior art references).) Contrary to Histogen's argument, SkinMedica contends that the patents' specifications make clear "that the use of a pharmaceutically acceptable carrier does not mandate the use of the claimed conditioned medium for internal administration only." (SkinMedica's CCB 19.)   According to SkinMedica, "the specifications describe . . . examples involving a pharmaceutically acceptable carrier that are not strictly confined to 'internal administration, such as embodiments that 'include formulations of the conditioned media with a salve or ointment for topical applications.'" (*Id.* (quoting '494 Patent col.2 ll.32–36).)

Histogen contends that the inventors acted as their own lexicographers and implicitly defined "pharmaceutically acceptable carrier" and "pharmaceutical carrier" to have other than their ordinary meaning. (Histogen's CCB 12–14; 22–23; *see Bell Atl.*, 262 F.3d at 1268 ("[T]he specification may define claim terms 'by implication' such that the meaning may be 'found or ascertained by a reading of the patent documents.'" (quoting *Vitronics*, 90 F.3d at 1582)).) According to Histogen, "[i]n every instance in which 'pharmaceutically acceptable carrier' is used in the specification, it refers to internal administration, as opposed to external use." (*Id.* (emphasis in original).) Histogen cites as an example the '494 patent's specification, wherein the inventors stated:

> Once the cell medium of the invention is conditioned, it may be used in any state. Physical embodiments of the conditioned medium include, but are not limited to, liquid or solid, frozen, lyophilized[,] or dried into a powder.  Additionally, the medium may be formulated with a *pharmaceutically acceptable carrier* as a vehicle for internal administration, applied directly to a food item or product, formulated with a salve or ointment for topical applications, or, for example, made into or added to surgical glue to accelerate healing of sutures following invasive procedures.

'494 Patent col.5 ll.14–23 (emphasis added).[11] According to Histogen, the use of the word "or" in this

---

[11]   *See also* '494 Patent, at [57] ("Additionally, the medium is formulated with a pharmaceutically acceptable carrier as a vehicle for internal administration . . . ."); *id.* col.24 ll.13–15 ("In another embodiment, the medium may be formulated with a pharmaceutically acceptable carrier as a vehicle for internal administration."); *id.* col.26 ll.56–58 ("The processed conditioned medium

1   passage evinces the inventors' intent to distinguish embodiments "formulated with a pharmaceutically
2   acceptable carrier as a vehicle or internal administration," where internal administration is required,
3   from other listed embodiments. (Histogen's CCB 13.)

4       Histogen's argument has some superficial appeal, but it does not withstand close scrutiny.
5   Other than in the claims and the abstract, the patents' specifications each use the term
6   "pharmaceutically acceptable carrier" four times. '494 Patent col.5 ll.14–23, col.24 ll.13–15, col.26
7   ll.13–31, col.26 ll.56–58; '746 Patent col.5 ll.26–32, col.27 ll.22–24, col.30 ll.20–22, col.30 ll.  In
8   each instance, the term refers to internal administration, as opposed to external use. But contrary to
9   Histogen's assertion, the inventors did not use "pharmaceutically acceptable carrier" in a manner
10  consistent with only a single meaning. (Histogen's Responsive CCB 13.)  The term does not refer to
11  a distinct concept, such that it would be illogical to construe it to have other than Histogen's proposed
12  construction. *See Bell Atl.*, 262 F.3d at 1271.  Rather, the inventors used the term in a manner just as
13  consistent with SkinMedica's proposed construction as with Histogen's.[12]

14      Further, Histogen's proposed construction would exclude embodiments described in the
15  specification. "A claim construction that excludes a preferred embodiment . . . 'is rarely, if ever
16  correct.'" *SanDisk.*, 415 F.3d at 1285 (quoting *Vitronics*, 90 F.3d at 1583); *see Verizon Servs. Corp.
17  v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim
18  terms in a way that excludes disclosed examples in the specification.").  Although "a claim need not
19  cover all embodiments," *Intamin*, 483 F.3d at 1337, the Federal Circuit "has cautioned against
20  interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple
21  ordinary meanings consistent with the intrinsic record," *Helmsderfer v. Bobrick Washroom
22  Equipment, Inc.*, 527 F.3d F.3d 1379, 1383 (Fed. Cir. 2008).  *But see Rolls-Royce, PLC v. United
23  Techs. Corp.*, 603 F.3d 1325, 1334–35 (Fed. Cir. 2010) (construing claim to exclude alternative

24

25  in a pharmaceutically acceptable carrier can be injected intradermally or subcutaneously . . . .").

26      [12]  A simple example illustrates this conclusion.  If one were to replace "pharmaceutically
    acceptable carrier," as it is used in the specification, with SkinMedica's proposed construction, the
    result would be far from nonsensical.  Thus, "In another embodiment, the medium may be formulated
27  with a pharmaceutically acceptable carrier as a vehicle for internal administration," 494 Patent col.24
    ll.13–15, becomes, "In another embodiment, the medium may be formulated with *solid or liquid
28  diluents or encapsulating substances that are suitable for administration to a human or lower animal*
    as a vehicle for internal administration."

09cv122

1    embodiment because "[a] claim construction that embraced both alternative embodiments would be

2    unreasonable"); *Helmsderfer*, 527 F.3d at 1383 (construing claim to exclude preferred embodiment

3    because construction "[left] open the possibility that claims not at issue . . . encompass[ed] omitted

4    embodiments").

5         Both independent claims of the '494 patent require "combining the conditioned medium with

6    a pharmaceutically acceptable carrier," '494 Patent col.32 ll.18–19, 46–48, which Histogen would

7    have the Court construe to mean "combining with a vehicle for internal administration."  Yet the

8    patent's specification and prosecution history describe embodiments that are not limited to internal

9    administration.[13]  Histogen's proposed construction of "pharmaceutically acceptable carrier," which

10   limits the term to internal administration, would exclude use of the claimed composition for the

11   various topical applications described in the specification and prosecution history.  SkinMedica's

12   proposed construction, on the other hand, is consistent with the term's ordinary meaning (*see* Salomon

13   Decl. ISO SkinMedica's CCB ¶ 20), is *not inconsistent* with the intrinsic record (*see, e.g.*, '494 Patent

14   col.5 ll.14–23; SkinMedica's CCB Ex. 4, at 105), and does not exclude the disclosed embodiments.

15   *See Helmsderfer*, 527 F.3d at 1383.

16        Although SkinMedica derives its proposed construction from extrinsic prior art references (*see*

17

18        [13]   *See, e.g.*, '494 Patent col.22 ll.34–36 ("Embodiments include formulations of the

19   conditioned media with a salve or ointment for topical applications."); *id.* col.22 ll.37–39 ("[T]he
     conditioned medium may be combined with a bandage . . . to promote and/or accelerate wound
     healing."); *id.* col.23 ll.54–57 ("In another embodiment, the conditioned media, or alternatively

20   particular extracellular matrix proteins elaborated into the media, are used to provide an excellent
     substance to coat sutures."); *id.* col.25 ll.20–27 ("The conditioned cell medium may also be added to

21   devices used in periodontal surgery in order to promote uniform tissue repair, to provide
     biodegradable contact lenses, corneal shields, or bone grafts, to provide surgical space fillers, to

22   promote soft tissue augmentation, particularly in the skin for the purpose of reducing skin wrinkles,
     and as urinary sphincter augmentation, for the purpose of controlling incontinence."); *id.* col.25

23   ll.42–45 ("[T]he compositions . . . may be used in a hydrogel, injectable, cream, ointment, and may
     even be added to eye shadow, pancake makeup, compacts[,] or other cosmetics to fortify the skin

24   topically."); *id.* col.27 ll.21–22 ("The conditioned media may be used as food additives and formulated
     into dietary supplements."); *id.* col.29 ll.43–48 ("The pharmaceutical formulations of the invention

25   may be delivered to a patient via a variety of routes using standard procedures well known to those
     of skill in the art.  For example, such delivery may be *site-specific*, oral, nasal, intravenous,

26   subcutaneous, intradermal, transdermal, intramuscular[,] or intraperitoneal.") (emphasis added);
     SkinMedica's CCB Ex. 4, at 105 ("The pharmaceutical compositions comprise cell culture

27   medium . . . , previously cultured by eukaryotic cells to form a conditioned medium, and a
     pharmaceutical carrier. . . . The pharmaceutical compositions, containing the conditioned medium,
     may be formulated into tablets, capsules, skin patches, inhalers, eye drops, nose drops, ear drops,

28   suppositories, creams, ointments, injectables, hydrogels[,] and into any other appropriate formulation
     known to one of skill in the art.").

09cv122

1   SkinMedica's CCB 19 (citing Salomon Decl. ISO SkinMedica's CCB ¶ 20 (citing, *inter alia*, U.S.

2   Patent No. 6,277,892, at col.10 ll.11–16 (filed Feb. 4, 1994))), these references illustrate what an

3   ordinarily skilled artisan would understand "pharmaceutically acceptable carrier" to mean and are

4   consistent with the intrinsic record. *See Phillips*, 415 F.3d at 1319.  Accordingly, the Court adopts

5   SkinMedica's proposed construction and **CONSTRUES** "pharmaceutically acceptable carrier" and

6   "pharmaceutical carrier" to mean "**solid or liquid diluents or encapsulating substances that are**

7   **suitable for administration to a human or lower animal**."

8   **7.    "cosmetic application"**

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction |
| --- | --- | --- |
| "cosmetic application" | Plain meaning, or "application as a preparation for beautifying, preserving or altering appearance" | "non-therapeutic internal use" |

13   The term "cosmetic application" appears in dependent claims 7 and 11 of the '494 patent.  It

14   does not appear in the '746 patent.

15   SkinMedica argues that "cosmetic application" "has a plain an ordinary meaning readily

16   apparent to lay people, not just persons of ordinary skill in the art."   (SkinMedica's CCB 20.)

17   According to SkinMedica, the '494 patent's specification "demonstrates that the term 'cosmetic

18   application' is used similarly in its ordinary manner."   (*Id.* at 21 (citing '494 Patent col.25 ll.42–45

19   ("[T]he compositions . . . may be used in a hydrogel, injectable, cream, ointment, *and may even be*

20   *added to eye shadow, pancake makeup, compacts*[,] *or other cosmetics to fortify the skin topically*.")

21   (emphasis added)).)  Thus, SkinMedica's proposed alternative construction incorporates the dictionary

22   definition of "cosmetic."  (*Id.* at 20–21 (citing *id.* Exs. 20–22 (defining "cosmetic")); *see Phillips*, 415

23   F.3d at 1318 ("[D]ictionaries and treatises can be useful in claim construction.").)

24   Citing its proposed construction of "pharmaceutically acceptable carrier," Histogen argues that

25   "cosmetic application" must be construed to require internal use.  (Histogen's CCB 14.)  Otherwise,

26   claims 7 and 11 "would be broader than or fail to limit claims 1 and 8," from which they depend.  (*Id.*)

27   Although Histogen recognizes that this construction would exclude embodiments described in the

28   specification, Histogen submits that "the fact that the specification describes such embodiments does

1  not support a broadening of the claim." (*Id.* at 15 (citing *TIP Sys., LLC v. Phillips & Brooks/Gladwin,*

2  *Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008)).)  Histogen further notes that its proposed construction

3  would not offend the plain meaning of "cosmetic" because the specification describes "formulations

4  in the form of injectables or hydrogels[, which] may be used to eliminate wrinkles, frown lines,

5  scarring[,] and to repair other skin conditions." (Histogen's Responsive CCB 19 (quoting '494 Patent

6  col.5 ll.48–51).)

7       The conclusion *supra* that "pharmaceutically acceptable carrier" has a broader meaning than

8  "a vehicle for internal administration" takes most of the wind out of Histogen's sails.  Unless claims

9  1 and 8 are limited to internal use, Histogen has provided no reason to limit claims 7 and 11 to internal

10  use.

11       Further, the authority Histogen cites for the proposition that "the patent need not encompass

12  all disclosed embodiments" is inapposite. *TIP Sys.*, 529 F.3d at 1373.  In that case, the district court's

13  claim construction excluded an alternative embodiment disclosed in the specification. *Id.* at 1372–73.

14  The Federal Circuit observed that "to construe the claim term to encompass the alternative

15  embodiment . . . would contradict the language of the claims."  Thus, the court concluded that the

16  district court did not err in construing the claim to exclude the alternative embodiment. *Id.* at 1373

17  (citing, *inter alia*, *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006) ("[W]here a

18  patent specification includes a description lacking a feature, but the claim recites that feature, the

19  language of the claim controls.")).

20       Here, there is no such conflict between the language of the claims and SkinMedica's proposed

21  construction.  To construe "cosmetic application" to include topical applications is consistent with the

22  language of the independent claims, which are not facially limited to internal uses.  At most,

23  SkinMedica's proposed construction of "cosmetic application" would contradict the Histogen's

24  proposed construction of "pharmaceutically acceptable carrier," which the Court rejected *supra*.

25       Accordingly, the Court adopts SkinMedica's proposed construction and **CONSTRUES**

26  "cosmetic application" to mean "**application as a preparation for beautifying, preserving or**

27  **altering appearance**."

28  //

**8.    "mesenchymal cells"**

| Claim language | Agreed-upon construction |
|---|---|
| "mesenchymal cells" | "cells of mesenchymal lineage" |

The term "mesenchymal cells" appears in claim 1 of the '746 patent.  It does not appear in the '494 patent.

At the hearing, the parties indicated that they reached an agreement as to the meaning of "mesenchymal cells."  (CC Hr'g Tr. 333 ("Mr. Long: . . . I think both parties are willing to agree that mesenchymal cells should be interpreted as cells of mesenchymal lineage, period.").)  Accordingly, the Court adopts the parties' agreed-upon construction and **CONSTRUES** "mesenchymal cells" to mean "**cells of mesenchymal lineage**."

**9.    "reducing intracellular oxidation in the keratinocytes"**

| Claim language | SkinMedica's proposed construction | Histogen's proposed construction |
|---|---|---|
| "reducing intracellular oxidation in the keratinocytes" | Plain meaning, or "reducing oxidation inside the keratinocyte cells" | "reducing oxidation due to the presence of antioxidant activity in the conditioned cell medium" |

The term "reducing intracellular oxidation in the keratinocytes" appears in claim 1 of the '746 patent.  It does not appear in the '494 patent.

Histogen contends that "[i]n order for the conditioned medium to reduce intracellular oxidation in the keratinocytes, it must contain factors that have antioxidant activity."  (Histogen's CCB 21.)  In support of this contention, Histogen cites section 7 of the specification, '746 Patent col.38 ll.7–44, wherein the inventors describe the effect of antioxidant activity of keratinocytes, *see, e.g.*, *id.* col.38 ll.35–39 ("Human keratinocytes exposed to Applicants' conditioned cell medium exhibited a statistically significant (p<0.0003) 50% reduction in intracellular oxidation compared to the same cells incubated in the presence of serum-free or serum-containing medium.") (citation omitted). (Histogen's CCB 21.)  Further, Histogen contends that, during the '746 patent's prosecution, the "inventors distinguished their invention based upon antioxidant activity in the conditioned medium." (Histogen's Responsive CCB 21 (citing Histogen's CCB Ex. N, at 177).)  According to Histogen, to overcome a rejection for lack of enablement, the inventors "argued that their invention was enabled

1   because 'it was known in the art at the time of the filing of the subject application that mesenchymal

2   cells from a large number of tissues produce antioxidants.'" (*Id.* at 21–22 (quoting Histogen's CCB

3   Ex. N, at 177); *see Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)

4   ("Arguments and amendments made during the prosecution of a patent application and other aspects

5   of the prosecution history . . . must be examined to determine the meaning of terms in the claims.").)

6       SkinMedica responds that Histogen attempts to improperly "read limitations from

7   embodiments described in the patent specification into the claims without . . . any textual reference

8   to those limitations in the plain language of the claims, or . . . 'words or expressions of manifest

9   exclusion or restriction, which is necessary to further narrow the claim language.'" (SkinMedica's

10  CCB 23 (quoting *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009));

11  *see also* SkinMedica's Responsive CCB 22.)  According to SkinMedica, although the '746 patent's

12  specification "discuss[es] a reason for the conditioned medium's capacity for 'reducing intracellular

13  oxidation in the keratinocytes,' the plain language of the claims is not limited to any particular reason

14  for reduced oxidation." (SkinMedica's CCB 23.)  "As such, it is improper to import such a

15  reason—*e.g.*, the presence of antioxidant activity—into the claims." (*Id.* at 23–24.)

16      The claim itself does not expressly indicate *how* the conditioned medium—through antioxidant

17  activity, for example—reduces intracellular oxidation in the keratinocytes.  In order to properly

18  determine the meaning of this phrase, the Court must consider it in light of the entire patent.  *See*

19  *Phillips*, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning

20  to the ordinary artisan after reading the entire patent.").

21      Here, the specification only describes one mechanism by which the conditioned medium

22  reduces intracellular oxidation in the keratinocytes, namely, antioxidant activity.  *See* '746 Patent col.7

23  l.65 to col.8 l.4 ("FIG. 5 is a graph representing the anti-oxidant activity in the conditioned cell

24  medium . . . on human epidermal keratinocytes in culture.  A statistically significant (p<0.003)

25  reduction in intracellular oxidation of approximately 50% was noted in human keratinocytes exposed

26  to the conditioned medium . . . ."); col.28 l.64 to col.29 l.6 ("[I]n another embodiment, the medium

27  of the invention is used to reduce cell aging and inhibit the activity of the factors which cause skin

28  cancer.  That the conditioned medium has antioxidant activity is shown in Section 7.1. . . . Applicants

have discovered that a statistically significant (p<0.003) intracellular oxidation of approximately 50% was noted in human keratinocytes exposed to Applicants' conditioned medium."); *id.* col.38 ll.7–44 (describing "[t]he antioxidant activity of the three-dimensional conditioned medium" and its effect on human keratinocytes). Accordingly, an ordinarily skilled artisan reading the claim in light of the specification would understand that, to the extent the conditioned medium reduces intracellular oxidation in the keratinocytes, it does so by virtue of the presence of antioxidant activity. *Cf. Bell Atl.*, 262 F.3d at 1271 (quoting *Vitronics*, 90 F.3d at 1582)).

Contrary to SkinMedica's argument, by limiting the claim to antioxidant-activity-induced reduction of intracellular oxidation, the Court does not impermissibly import a limitation from a preferred embodiment into the claim. Rather, the portions of the prosecution history that describe the conditioned medium of the invention as having antioxidant activity refer to the invention *as a whole*, as opposed to a specific embodiment. *See* '746 Patent col.7 l.65 to col.8 l.4 (referring to antioxidant activity "in the conditioned cell medium"); *id.* col.28 ll.66–67 ("[T]he conditioned medium has antioxidant activity . . . ."); *id.* col.29 ll.8–9 ("[T]he conditioned medium *of the invention* has strong antioxidant acitivty." (emphasis added)); *id.* col.38 ll.7–44 (describing "[t]he antioxidant activity of the three-dimensional conditioned medium"). Repeated references in the specification to the invention as a whole can limit a claim, provided that the specification as a whole and prosecution history do not warrant a contrary result. *See Netcraft Corp. v. Ebay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008).

Here, the prosecution history supports limiting the claim to reducing intracellular oxidation in the keratinocytes due to antioxidant activity in the conditioned medium. To overcome a rejection for lack of enablement, the inventors asserted that "[t]he invention . . . increases the amount of antioxidant generated during the culture of mesenchymal cells thereby providing a medium that can be used in reducing intracellular oxidation." (Histogen's CCB Ex. N, at 177.) The inventors emphasized that "most mesenchymal cells are capable of generating anti-oxidant molecules," and accordingly, "no undue experimentation is required for implementing the claimed method [of inhibiting or reversing deleterious effects to keratinocytes, where the effects are induced by

1  intracellular oxidation,] in conjunction with mesenchymal cells."[14]  (*Id.* at 178.)  Thus, as in the

2  specification, the inventors made clear during prosecution that it was the invention's antioxidant

3  activity, and not some other mechanism, that had the effect of reducing intracellular oxidation in the

4  keratinocytes.

5  　　　　Because the specification only describes one mechanism by which the invention reduces

6  intracellular oxidation in the keratinocytes, the Court concludes that the claim only extends to

7  reducing oxidation via that mechanism.  *See Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352

8  (Fed. Cir. 2001) ("Although the specification need not present every embodiment or permutation of

9  the invention and the claims are not limited to the preferred embodiment of the invention, neither do

10 the claims enlarge what is patented beyond what the inventor has described as the invention." (citation

11 omitted)).　　Accordingly, the Court **CONSTRUES** "reducing intracellular oxidation in the

12 keratinocytes" to mean "**reducing intracellular oxidation in the keratinocytes due to the presence**

13 **of antioxidant activity in the conditioned medium**."

14 //

15 //

16 //

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26

27 　　　[14] The Court does not agree, however, that the inventors "distinguished" their invention from
the prior art based on antioxidant activity in the conditioned medium.  (Histogen's Responsive CCB

28 21.)  Rather, they simply argued that the invention was enabled because one of skill in the art could
implement the claimed method without undue experimentation.  (*See id.* Ex. N, at 176–178.)

**CONCLUSION**

In summary, and for the reasons stated herein, the Court construes the disputed claim terms of the '494 and '746 patents as follows:

| Claim language | Court's construction |
|---|---|
| "culturing fibroblast cells in three-dimensions" | "growing fibroblast cells in three dimensions (excluding growing fibroblast cells in monolayers or on microcarrier beads)" |
| "cultured in three-dimensions" | "grown in three dimensions (excluding grown in monolayers or on microcarrier beads)" |
| "culturing mesenchymal cells in three-dimensions" | "growing mesenchymal cells in three dimensions (excluding growing mesenchymal cells in monolayers or on microcarrier beads)" |
| "framework . . . formed into a three-dimensional structure" | "a three-dimensional structure composed of any material and/or shape that (a) allows cells to attach to it (or can be modified to allow cells to attach to it); and (b) allows cells to grow in more than one layer" |
| "substantially enveloping" and "substantially envelop" | "substantially enclosing, surrounding, or covering" |
| "conditioned medium" and "conditioned cell medium" | "a formulation containing extracellular protein(s) and cellular metabolites, which has previously supported the growth of cells having been cultured in three-dimensions" |
| "pharmaceutically acceptable carrier" and "pharmaceutical carrier" | "solid or liquid diluents or encapsulating substances that are suitable for administration to a human or lower animal" |
| "cosmetic application" | "application as a preparation for beautifying, preserving or altering appearance" |
| "mesenchymal cells" | "cells of mesenchymal lineage" |
| "reducing intracellular oxidation in the keratinocytes" | "reducing intracellular oxidation in the keratinocytes due to the presence of antioxidant activity in the conditioned medium" |

**IT IS SO ORDERED.**

DATED:  May 24, 2011

_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge

09cv122