# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SKINMEDICA, INC.,

CASE NO. 09-CV-122 JLS (RBB)

**[REDACTED] ORDER**

                                        Plaintiff,

vs.

HISTOGEN INC.; HISTOGEN
AESTHETICS LLC; GAIL K. NAUGHTON,

                                        Defendants.

_____

AND RELATED COUNTERCLAIMS

Presently before the Court are several motions for summary judgment of various claims and counterclaims brought by both parties, as well as SkinMedica's motion for final judgment under Rule 54(b), and Histogen's motion for attorneys' fees.  Having considered the parties' arguments and the law, the Court rules as follows:

1. SkinMedica's motion for partial summary judgment (ECF No. 196) is **GRANTED**.

2. Histogen's motion for summary judgment (ECF No. 211) is **DENIED**.

3. SkinMedica's motion for final judgment (ECF No. 237) is **DENIED**.

4. Histogen's motion for attorneys' fees (ECF No. 287) is **DENIED**.

- 1 -

**BACKGROUND**

Plaintiff SkinMedica is a privately held company that develops and sells products for treating dermatologic conditions and diseases affecting skin appearance.  SkinMedica sells its products primarily to dermatologists and plastic surgeons.  Among SkinMedica's products is its TNS® (for Tissue Nutrient System) line of anti-aging products.  The main ingredient in the TNS line of products is NouriCel®.  (*See* FAC ¶ 25, ECF No. 31.)

NouriCel was originally developed by Advanced Tissue Science, Inc. ("ATS").  In 2002, ATS filed for bankruptcy.  In 2003, through the ATS bankruptcy proceedings, SkinMedica claims to have acquired all of the assets, "including the trade secrets and know-how," related to NouriCel through an Asset Purchase Agreement ("APA").  (*See* FAC ¶¶ 8–10.)  The APA gave SkinMedica the rights to U.S. Patent Nos. 6,372,494 (the '494 patent) and 7,118,746 (the '746 patent), asserted in this lawsuit.  (*See* FAC ¶¶ 16–17.)

Defendant Gail Naughton was the co-founder, President, Chief Operating Officer, and Chief Scientific Officer at ATS.  (FAC ¶ 10.)  She was also the lead named inventor on the '494 and '746 patents.  (FAC Exs. A, B.)  Naughton left ATS shortly after it filed for bankruptcy.  She is now the Chief Executive Officer and Chairman of the Board of Directors for Defendant Histogen.  (FAC ¶ 4.)

During her tenure at ATS, Naughton and her colleagues experimented with NouriCel, ultimately discovering that NouriCel could possibly stimulate hair growth.  By September 2002, Naughton presented a confidential report on NouriCel's hair growth potential to ATS's Scientific Advisory Board ("SAB Report").  In her official capacity as Vice Chairman of ATS, Naughton claims to have been authorized to discuss the contents of the SAB Report with outside parties, including a former ATS employee no longer under a confidentiality agreement, and competing pharmaceutical companies.

Beginning in 2004, Naughton and Histogen began filing patent applications for "conditioned medium" research similar to the NouriCel research Naughton performed at ATS. However, as of January 2009, the U.S. Patent and Trademark Office and the European Patent Office had rejected all of these claims in light of prior art.

- 2 -

1    In October 2008, SkinMedica became aware that Histogen planned to launch a line of skin
2    care products based on a conditioned medium called ReGenica™ that sounded similar to
3    SkinMedica's NouriCel technology. On January 22, 2009, SkinMedica filed the instant lawsuit
4    against Naughton, Histogen, and Histogen Aesthetics (collectively, "Histogen"). Histogen filed
5    counterclaims for a declaration of patent noninfringement and unfair competition under California
6    statutory law and common law. (ECF No. 35.) And each side asserts various affirmative defenses
7    to the other's claims. (*Id.*; ECF No. 40.)

8    On November 21, 2011, the Court granted Histogen's motion for partial summary
9    judgment of noninfringement of both the '494 and the '746 patents. (ECF No. 228.) Thus,
10   SkinMedica's remaining claims are for misappropriation of trade secrets, breach of contract,
11   imposition of constructive trust, and unfair competition. Histogen now moves for summary
12   judgment of the first three of these claims, and for an award of attorneys' fees for its defense of
13   SkinMedica's infringement claims. SkinMedica moves for partial summary judgment of
14   Histogen's unfair competition counterclaims, as well as for final judgment as to noninfringement
15   under Federal Rule of Civil Procedure 54(b).

16   A motion hearing was held on March 15, 2012, and the matters taken under submission.

17                                          **ANALYSIS**

18   **1. Cross-Motions for Summary Judgment**

19   *A. Legal Standard*

20   Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where
21   (1) the moving party demonstrates the absence of a genuine issue of material fact and (2)
22   entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
23   "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could
24   affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);
25   *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). For a dispute to be "genuine," a reasonable
26   jury must be able to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

27   The initial burden of establishing the absence of a genuine issue of material fact falls on the
28   moving party. *Celotex*, 477 U.S. at 323. The movant can carry his burden in two ways: (1) by

1   presenting evidence that negates an essential element of the nonmoving party's case; or (2) by

2   demonstrating that the nonmoving party "failed to make a sufficient showing on an essential

3   element of her case with respect to which she has the burden of proof." *Id.* at 322–23.

4         Once the moving party establishes the absence of genuine issues of material fact, the

5   burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed

6   fact remains. *Celotex*, 477 U.S. at 324.  The nonmoving party cannot oppose a properly supported

7   summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."

8   *Anderson*, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all

9   inferences drawn from the underlying facts in the light most favorable to the nonmoving party.

10   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

11   **B. SkinMedica's Motion for Summary Judgment**

12         SkinMedica aruges that Histogen's measure of damages under its two unfair competition

13   counterclaims fails for three primary reasons.[1]  First, nonrestitutionary disgorgement damages are

14   not available under Cal. Bus. & Prof. Code § 17200 ("UCL" or "section 17200").  Second,

15   Histogen's common law unfair competition counterclaim fails because it does not allege "passing

16   off."  Third, SkinMedica argues Histogen's requested damages are too uncertain to be recoverable.

17   (*See* Pl.'s MSJ 1, ECF No. 219.)  The Court addresses these arguments in turn.[2]

18

19         [1] The Court declines to reject SkinMedica's motion on the basis that it is successive of a
   summary judgment motion filed on September 14, 2009.  (ECF No. 68.)  Although Histogen correctly
20   points out that the Court has discretion to refuse to consider a second summary judgment motion as
   to the same claim (*See* Def.'s Opp'n to Pl.'s MSJ 9-10), courts faced with a successive motion "often
21   exercise their discretion to consider the new arguments in the interests of judicial economy."
   *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2011 WL 2690437 at *2 n.1 (N.D. Cal. July 8,
22   2011); *see also Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 2010 WL 2854247 at *2 (E.D. Wash.
   July 19, 2010) ("The Court declines to pass on this opportunity to narrow the issues.")  For the same
23   reasons, and to avoid inequity, the Court also declines to reject Histogen's motion as to SkinMedica's
   breach of contract claim as successive.  (*See* Pl.'s Opp'n to Def.'s MSJ 20.)
24

25         [2] The Court rejects Histogen's argument that the Court's analysis and decision should be
   limited narrowly to "lost profits."  Although SkinMedica's motion caption somewhat misleadingly
26   states it seeks "Partial Summary Judgment on Defendants' Lost Profits Damages Claim," the Court
   finds that the substance of the motion is not so limited.  SkinMedica's memorandum clearly provides
27   adequate notice of the three different bases asserted for summary judgment, which are not directed
   solely to "lost profits."  Given that Histogen's own operative answer, as well as its damages expert's
28   description, uses the term "profits" repeatedly to describe the relief sought by Histogen under its
   unfair competition claims, the Court will not fault SkinMedica for mirroring that language in styling
   its motion caption.

*(i) Statutory UCL Claim*

According to SkinMedica, restitution is the only measure of nonpunitive monetary relief available under the UCL, and Histogen has not and cannot claim damages in the form of restitution. In fact, SkinMedica points out that "damages" of any sort are not recoverable under the UCL. (Pl.'s MSJ 4-5.) Histogen counters that SkinMedica has mischaracterized Histogen's requested relief under the label of "lost profits" when in fact Histogen seeks "to recover its *lost value* as a result of SkinMedica's illegal and fraudulent business practices, which is a proper remedy under section 17200."[3] (Def.'s Opp'n to Pl.'s MSJ 10, ECF No. 267.)

(a) Available Remedies under the UCL

SkinMedica is correct that damages are not available under the UCL; the available remedies are limited to restitution and injunctive relief. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1147 (2003); *Smit v. Charles Schwab & Co., Inc.*, 2011 U.S. Dist. LEXIS 25589 at *28 (N.D. Cal. Mar. 8, 2011). Courts are authorized to fashion remedies to prevent, deter, and compensate for unfair business practices. *See* Cal. Bus. & Prof. Code § 17203. To that end, California courts have found that injunctions are the proper remedy to combat unfair business practices, and that "[a]ctual direct victims of unfair competition may obtain restitution as well." *Korea Supply Co.*, 29 Cal. 4th at 1152.

In determining what fits into this narrow category of restitution, the object is "to restore the status quo by returning to the [actual direct victim] funds in which he or she has an ownership interest." *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1012 (2005). Thus, "in the UCL context . . . restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it." *Id.* at 1013 (quoting *Madrid v. Perot Systems*

---

[3] Histogen argues further that SkinMedica's motion ignores the fact that Histogen also seeks an injunction under its UCL claim. (Def.'s Opp'n to Pl.'s MSJ 10.) SkinMedica admits, and the Court agrees, that Histogen's UCL claim will survive, regardless of the Court's ruling on SkinMedica's summary judgment motion. (Pl.'s Reply 2., ECF No. 284.) The Court interprets SkinMedica's motion as requesting only partial summary judgment of Histogen's requested monetary relief under its UCL claim, not of the injunctive relief sought thereunder. Courts have granted summary judgment on the issue of damages under a UCL claim while allowing the UCL claim to go forward. *See, e.g., Nat'l Rural Telecomm. v. Directv, Inc.*, 319 F. Supp. 2d 1059, 1082 (C.D. Cal. 2003) (granting summary judgment as to damages but denying summary judgment as to several prongs under section 17200).

1   *Corp.*, 130 Cal. App. 4th 440, 455 (2005)).  In order to constitute restitution, the victim must have

2   at least an identifiable vested interest in the money he seeks to recover.  *Nat'l Rural Telecomm.*,

3   319 F. Supp. 2d at 1080.  The interest may not be contingent upon an uncertain future event.  *Id.*

4       Disgorgement is a broader remedy than restitution, but it may sometimes include a

5   restitutionary element.  *Id.*  Restitutionary disgorgement, which focuses on the victim's loss, may

6   be recovered under the UCL.  This is typified in situations "where the disgorged money or

7   property [came] from the prospective plaintiff in the first instance."  *Id.* (quoting *Korea Supply*, 29

8   Cal. 4th at 1152).  However, nonrestitutionary disgorgement, which focuses on the defendant's

9   gain and does not require that the plaintiff suffered an identifiable loss, is not available under the

10  UCL.  Thus, disgorgement of profits is an available remedy for an individual private plaintiff

11  under the UCL only to the extent that it constitutes restitution.  *Id.*

12  (b)  Histogen's Requested Remedy

13      In the operative answer, Histogen states a counterclaim for unfair competition under

14  section 17200.  (Answer 12, ECF No. 35.)  According to Histogen, "SkinMedica's actions and

15  conduct have had detrimental commercial, professional and personal impact on the Histogen-

16  Related Parties."  (*Id.* at 14.)  This impact took two primary forms.  First, it allegedly caused

17  Histogen's "existing and prospective funding sources to decline to fund Histogen" or to "modify

18  the manner in which they fund and interact" with Histogen to its detriment.  Second, it caused

19  Histogen's "existing and prospective sales, marketing and/or distribution sources to decline to

20  collaborate, do business or interact with Histogen" or to "modify the manner in which they

21  collaborate, do business or interact" with Histogen to its detriment.  In fashioning its requested

22  remedy, Histogen alleges:

23      As a direct result of SkinMedica's unfair competition, SkinMedica has wrongfully
        taken the Histogen-Related Parties' profits and the benefit of the Histogen-Related
24      Parties' creativity and investment of time, energy and money.  SkinMedica should
        therefore disgorge all profits and other ill-gotten gain and further should be ordered
25      to perform full restitution to the Histogen-Related Parties and restore to the
        Histogen-Related Parties all monies which SkinMedica acquired or obtained by its
26      unfair competition.

27  (*Id.* at 15.)  To this end, Histogen requests a trust be imposed upon "SkinMedica's ill-gotten gains

28  and/or monies which were acquired and/or obtained by means of unfair competition."  (*Id.*)

1    In opposition to the instant motion, Histogen frames the above-referenced remedy as

2    "diminution of value," which it styles as "a restitutionary remedy" that is proper under the UCL.

3    (Def.'s Opp'n to Pl.'s MSJ 10.)  Histogen attempts to explain what it meant in seeking

4    disgorgement of SkinMedica's profits and ill-gotten gains, stating that "lost profits are but one

5    component of several other types of losses and harm incurred by Histogen, all of which combined

6    to cause a loss of value to Histogen." (*Id.*)  In support of this lost *value* theory, Histogen submits a

7    report from its damages expert, Dr. Ryan Sullivan.  Dr. Sullivan states:

8
9            SkinMedica and Histogen have established on multiple occasions that they are
             direct competitors. . . . The nature of the direct competition between SkinMedica
             and Histogen means that sales not made by Histogen were made by SkinMedica.
10           Because SkinMedica has earned the sales that Histogen would have made—i.e.,
             SkinMedica has taken those sales from Histogen—lost profits would restore
11           Histogen.

12    (Sullivan Decl. ISO Def.'s Oppn to Pl.'s MSJ ¶ 10.)  The expert report details Dr. Sullivan's

13    attempts to identify Histogen's "valuation prior to the conduct that reflects ownership of property,

14    as I understand it, which was misappropriated by SkinMedica." (*Id.* ¶ 11.)  Thus, the "lost value"

15    sought by Histogen "reflects ownership of property that would be restored by the amount

16    calculated in my report." (*Id.*)  Dr. Sullivan explains that unjust enrichment would not be a proper

17    measure of restitution damages here "because SkinMedica's incremental profits are higher than the

18    incremental profits Histogen would have earned on those sales." (*Id.* ¶ 16.)

19    The Court finds Histogen's requested remedy does not qualify as restitution under the

20    UCL.  Histogen does not have an identifiable and vested interest in the money it seeks to recover.

21    At best, Histogen's claim is an expectancy or contingent interest in future profits or value, not

22    actual or committed sales or measurable loss in value.

23
24
25    
26
27
28

09cv122

1 ████████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 █████████████████████████████████████████████████████████████

5 █████████████████████████████████████████████████████████████

6 ███████████████████████████

7    In *People v. Beaumont*, 111 Cal. App. 4th 102, 135 (2003), cited by Histogen, the

8 California Court of Appeal upheld the trial court's order requiring defendants to disgorge

9 unauthorized rents to the affected tenants.  Although the remedy came in the form of

10 disgorgement, the court found it was a "carefully crafted restitution remedy . . . based on

11 appropriate factors, and it accomplishes the statutory objective of restoring to the victim sums

12 acquired through defendant's unfair practices."  *Id.*  Thus, the disgorgement in that case was a

13 proper restitutionary remedy under the UCL.  *Beaumont* did not, as Histogen seems to argue, hold

14 that diminution in value is itself always a proper remedy under the UCL.  (*See* Def.'s Opp'n to

15 Pl.'s MSJ 11.)  Rather, in *Beaumont*, the proper measure of restitution was the identifiable

16 diminution in value of certain tenants' vested leasehold interests.

17    In another analogous situation, *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th

18 163, 177 (2000), the California Supreme Court allowed the plaintiff to recover wages for overtime

19 she had actually worked as a restitutionary remedy under the UCL.  In so doing, the court used the

20 principle of equitable conversion to find that earned wages that are due and payable are "as much

21 the property of the employee who has given his or her labor to the employer in exchange for that

22 property as is property a person surrenders through an unfair business practice."  *Id.* at 178

23 (internal citations omitted).

24    Similarly, in *United States v. Rodrigues*, 229 F.3d 842, 847 (9th Cir. 2000), the Ninth

25 Circuit examined restitution under a different statute and held a company did not have a vested

26 interest in lost business opportunity based on future projects not yet under binding contracts.  The

27 court noted, however, that a commitment letter in another project was a "thing of value" and stated

28 that if the plaintiff proved the defendant had "usurped Saratoga's vested contractual interest in the

- 8 -

property, restitution for that interest would be proper." *Id.*; *see also MAI Sys. Corp. v. UIPS*, 856 F. Supp. 538, 542 (N.D. Cal. 1994) (finding that compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims under the UCL).

Here, as in *Rodrigues*, the relief Histogen requests is essentially damages, not the return of money in which it has an identifiable vested property interest. *Cf. Nat'l Rural Telecomm.*, 319 F. Supp. 2d at 1082 (finding that the plaintiffs could not recover "restitution" damages for profits plaintiffs would have received had the alleged unfair business practice not occurred because this was essentially a request for damages). The cases examined above make clear that parties cannot simply restyle speculative damages claims as "restitution" for sales they might have made, or value their business might have lost or gained, in order to obtain relief under section 17200. To allow Histogen to recover for these contingent values would be to allow the UCL to function as "an all-purpose substitute for a tort or contract action, something the legislature never intended." *Id.* (quoting *Korea Supply*, 29 Cal. 4th at 1151); *see also Echostar Satellite Corp. v. NDS Group PLC*, 2008 U.S. Dist. LEXIS 110425 at *26 (C.D. Cal. Oct. 15, 2008) ("EchoStar's proposed definition of restitution would eviscerate the distinction between restitution and damages. Any plaintiff who suffered injury to property could claim restitution because the defendant 'took away' the value of the property. This is not an equitable remedy authorized under [the UCL].")

Thus, Histogen has not raised a genuine issue of material fact as to whether it has a vested identifiable interest in the monetary relief it has requested under its UCL claim. Because restitution is the only form of monetary relief recoverable under the UCL, the Court **GRANTS** SkinMedica's motion for partial summary judgment as to damages currently sought under Histogen's UCL claims. Histogen's claim for injunctive relief under the UCL survives, as such relief is not dependent upon the right to seek restitution.[4] If Histogen wishes, it may seek leave to amend its UCL claim to specify a form of monetary relief that actually constitutes restitution, consistent with the Court's discussion of restitutionary remedies above.

---

[4] Indeed, not only are the two remedies entirely independent, but injunctive relief is "the primary form of relief available under the UCL," while restitution is merely "ancillary." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009)).

1    *(ii) Common Law Unfair Competition Claim*

2         SkinMedica admits that lost profits damages are available under a common law unfair

3   competition claim, but argues that Histogen cannot recover under this claim because it has not

4   alleged "passing off," which is required to state a claim for common law unfair competition. (Pl.'s

5   MSJ 9.)  Histogen counters that common law unfair competition is not limited to classic "passing

6   off," and that it has stated a viable common law claim. (Def.'s Opp'n to Pl.'s MSJ 13-15.)  In the

7   alternative, Histogen argues that it has alleged passing off. (*Id.* at 16-17.)

8   (a) Scope of Common Law Unfair Competition

9         Both parties agree that the common law tort of unfair competition had its origins in

10   allegations of "passing off." (*See* Pl.'s MSJ 9; Def.'s Opp'n 14.)  In *Bank of the West v. Superior*

11   *Court*, 2 Cal. 4th 1254, 1263 (Cal. 1993), the court stated in the context of an insurance coverage

12   dispute that:

> The common law tort of unfair competition is generally thought to be synonymous
> with the act of "passing off" one's goods as those of another.  The tort developed as
> an equitable remedy against the wrongful exploitation of trade names and common
> law trademarks that were not otherwise entitled to legal protection.  According to
> some authorities, the tort also includes acts analogous to "passing off," such as the
> sale of confusingly similar products, by which a person exploits a competitor's
> reputation in the market.

17   Although, as Histogen points out, this language is arguably dicta, the Ninth Circuit has followed

18   this characterization of common law unfair competition by California Supreme Court.

19         For example, in *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir.

20   2008), the Ninth Circuit quoted from the above-excerpted language in *Bank of the West* in

21   affirming the district court's dismissal of a claim under California common law unfair competition

22   law because the plaintiff had "not alleged that the [defendants] have passed off their goods as

23   those of another nor that they exploit trade names or trademarks . . . ."  And district courts in

24   California have followed *Sybersound* in limiting common law unfair competition to allegations of

25   "passing off" or analogous acts. *See, e.g., Oracle Corp. v. Druglogic, Inc.*, 2011 U.S. Dist. LEXIS

26   133642 at *37-43 (N.D. Cal. Nov. 16, 2011) ("DrugLogic's claim for unfair competition fails to

27   state a claim because no passing off, or any analogous claim, is alleged."); *see also Amaretto*

28   *Ranch*, 2011 WL 2690437 at *2 (N.D. Cal. July 8, 2011).

Histogen's attempt to extend common law unfair competition beyond its grounding in consumer deception is unavailing. Histogen cites to the concurring and dissenting opinion of Justice Kennard in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163 (1999), for the proposition that unfair competition has a broad scope. (Def.'s Opp'n to Pl.'s MSJ 14.) In that case, the California Supreme Court dealt with a cause of action under the UCL, not common law unfair competition. In her concurring and dissenting opinion, Justice Kennard began a discussion of the UCL claim by examining the history of unfair competition in general, starting with common law. Although Histogen makes much of *Bank of the West*'s discussion of common law unfair competition as dicta and consequently unpersuasive, its own reliance upon *Cel-Tech* is by that same logic even more tenuously grounded. And Histogen's omission of crucial words from its quoted text is further misleading. In full, Justice Kennard wrote: "Even though the tort has been extended to situations other than classic 'passing off,' deceptive conduct has remained at the heart of unfair competition." *Cel-Tech,* 20 Cal. 4th at 193 (Kennard, J., concurring and dissenting). Thus, taken in the proper context, *Cel-Tech* is not inapposite of *Bank of the West* or *Sybersound Records*. All of these cases make clear that the common law tort of unfair competition consists of "passing off" or analogous acts, and is rooted in preventing conduct that harms competitors by deceiving customers.

(b)  Histogen's Common Law Unfair Competition Claim

Histogen states that, even if common law unfair competition is limited to "passing off" and analogous acts, Histogen has alleged and provided evidence to support a claim of passing off. According to Histogen, SkinMedica

> unlawfully caused Dr. Zoe Draelos, a preeminent physician and scientist in the field of cosmetic dermatology, to leave Histogen and to provide her services solely to SkinMedica. As described . . . SkinMedica has since publicly passed off Dr. Draelos' services and preeminent reputation as those of SkinMedica, solely for its benefit, to the exclusion and detriment of Histogen.

(Def.'s Opp'n to Pl.'s MSJ 16.) However, even viewing all the evidence in the light most favorable to Histogen, Histogen has not pointed to any facts that support this bare allegation that SkinMedica has been "actively passing off the services of Dr. Draelos as those of SkinMedica" in such a way as to cause consumer confusion.

- 11 -

1    The one piece of evidence cited in support of Histogen's allegation is the declaration of
2    Gail K. Naughton in opposition to SkinMedica's motion for summary judgment. (Naughton Decl.,
3    Def.'s Opp'n to Pl.'s MSJ Ex. 3.)  However, this declaration does not contain any indication of
4    passing off.  Although the declaration states facts relating to SkinMedica's recruitment of Dr.
5    Draelos and the negative impact upon Histogen of Dr. Draelos' decision to resign from Histogen's
6    Scientific Advisory Board ("SAB"), the declaration does not state even one instance of consumer
7    confusion based on Dr. Draelos' affiliation. (*See* Naughton Decl. ¶¶ 14-35.)  Gail Naughton states
8    that "Histogen board members and other SAB members made many inquiries regarding why Dr.
9    Draelos resigned from Histogen," but does not even allege that any board members or customers
10   were confused or made any decisions based on a misunderstanding caused by SkinMedica's
11   trading on Histogen's reputation or goodwill. (*Id.* ¶ 33.)  If anything, this statement indicates the
12   members were well aware of Dr. Draelos' change in affiliation, even if they did not understand it.

13   Nor has Histogen pointed to any precedent in which a court has held such allegations
14   constitute common law unfair competition under any standard.  The cases it cites, including
15   *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327 (1990), *San Jose Construction,*
16   *Inc. v. S.B.C.C., Inc.,* 155 Cal. App. 4th 1528 (2007), *Greenly v. Cooper*, 77 Cal. App. 3d 382
17   (1978), *S. Cal. Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431 (1960), and *Muranaka Farm,*
18   *Inc. v. Huacuja*, 2006 WL 3317733 at *6-7 (Ct. Cal. App. Nov. 16, 2006), all deal with instances
19   in which the alleged perpetrator of unfair competition unlawfully or deceptively obtained
20   information and used that information to solicit the victim's clients and customers.  Here, Histogen
21   has focused entirely on SkinMedica's unlawful and deceptive actions in causing Dr. Draelos'
22   resignation, and the resulting negative impact on Histogen.  But the crucial link to consumer
23   deception, present even in the cases Histogen holds up as establishing a broad reach for common
24   law unfair competition, is completely absent here.

25   For these reasons, the Court finds Histogen has not raised a genuine issue of material fact
26   as to its common law unfair competition claim.  As explained *supra* at n. 2, the Court interprets
27   SkinMedica's motion as one requesting adjudication of Histogen's common law unfair
28   competition claim in its entirety.  Looking beyond the motion's caption to its substance, this is the

only plausible interpretation of SkinMedica's arguments, of which Histogen had notice and opportunity to reply. Accordingly, SkinMedica's motion for summary judgment as to Histogen's common law unfair competition claim is **GRANTED**.

*(iii) Speculative and Uncertain Damages*

Because the Court finds summary judgment is proper based on SkinMedica's motion as detailed above, it need not address SkinMedica's third argument that Histogen's requested monetary relief is too speculative and uncertain. Histogen's only remaining claim is that for injunctive relief under the UCL, which does not implicate these concerns with regard to damages.

**C. Defendant Histogen's Motion for Summary Judgment**

*(i) Trade Secrets*

California has adopted a version of the Uniform Trade Secret Act ("UTSA"). Cal. Civ. Code § 3426 et seq. The UTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d). The UTSA further defines "misappropriation" of a trade secret as

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (A) Used improper means to acquire knowledge of the trade secret; or
> >
> > (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> >
> > > (i) Derived from or through a person who had utilized improper means to acquire it;
> > >
> > > (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > >
> > > (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

1

2          (C)  Before a material change of his or her position, knew or had
           reason to know that it was a trade secret and that knowledge of it had been
3          acquired by accident or mistake.

4    *Id.* § 3426.1(b).

5          Histogen moves for summary judgment of SkinMedica's trade secret misappropriation

6    claims based on three primary arguments: first, that SkinMedica lacks standing to sue as it does

7    not own the trade secrets; second, that each of the three alleged trade secrets do not constitute

8    protectable trade secrets; and third, that the trade secrets were not misappropriated.[5]  (*See*

9    *generally* Def.'s MSJ 2-21, ECF No. 220.)  Before addressing each of these arguments, the Court

10   first describes briefly each of SkinMedica's alleged trade secrets.[6]

11   (a)  The Alleged Trade Secrets

12          (1)  The Hair Growth Project

13   ███████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████

15   ████████████████████████████████  (Pl.'s Opp'n to Def.'s MSJ 5, ECF No. 265.)  In

16   support of this contention, SkinMedica provides the technical report prepared for the ATS

17   Scientific Advisory Board ("SAB") detailing these results, which was explicitly marked as

18   "Confidential."  (*Id.* (citing Naughton Dep. at Ex. E, and SAB Report, Ex. G.))

19   ███████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████

21   _____

22          [5] SkinMedica does not contest Histogen's argument that the alleged Serum-Free Culture
     Method trade secret was voluntarily abandoned.  For the sake of clarity and consistency, the Court will
     refer to the three remaining trade secrets as follows: (1) the Hair Growth Project; (2) the Bioreactor
23   Method; and (3) the Concentration System.

24          [6] Histogen also argues broadly that SkinMedica's trade secret claims should fail because they
     have not been identified with "sufficient particularity."  (Def.'s MSJ 2-3.)  This argument is
25   unconvincing.  A party's identification of its trade secret is sufficient where the identification "clearly
     refer[s] to trade secret material."  *Imax Corp. v. Cinema Techs., Inc.*, 152 F.2d 1045, 1057 (9th Cir.
26   1982).  As discussed in the following section, SkinMedica has sufficiently identified the trade secrets
     in its amended response to Interrogatory No. 1, and the expert reports of Rod Goodson and Tan
27   Leminh.  *See, e.g., Neothermia Corp. v. Rubicor Medical, Inc.*, 345 F. Supp. 2d 1042, 1044 (N.D. Cal.
     2004) (stating there was "no real dispute that [the plaintiff] has in fact identified its trade secrets with
28   'reasonable particularity' . . . by way of interrogatory responses and declarations.")  The Court finds
     SkinMedica's interrogatory response more than reasonably identifies the claimed trade secrets.



1   ▮▮▮▮▮▮▮▮▮▮ (Am. Resp. to Interrog. No. 1 ("AR1") at 10, Pl.'s

2   Opp'n to Def.'s MSJ Ex. A.) ▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮ (*Id.* at 11.) ▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮ (*Id.*)

8   ▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮ (SAB Report

10  2.) ▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮ (*Id.*) ▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮ (*Id.* at 12.)  When asked what conclusions she drew from reading

15  the report, Gail Naughton responded that ▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮ a conclusion which she believed was novel and potentially

18  valuable.  (Naughton Dep. at 169, 175.)

19      (2) The Bioreactor Method

20      SkinMedica claims that ATS developed "methodology for producing conditioned media

21  having a high count of growth factors (*e.g.*, NouriCel) by ▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮ (AR1 at 4.) ▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮ (Pl.'s Opp'n to Def.'s MSJ 13-14.)

26      According to the expert report of Tan Leminh, a former Senior Product Development

27  Engineer at ATS  who worked on developing cell culture processes, ATS developed this

28  methodology in an effort to ▮▮▮▮▮▮▮▮▮▮

1    ████████████████████████████████████████████████ (Leminh Decl. ¶ 11,

2    Pl.'s Opp'n to Def.'s MSJ Ex. CC.)

3           (3)  The Concentration System

4           Finally, SkinMedica alleges ATS developed a ██████████████████████

5    ████████████████████████████████████████████████████████████████████

6    ████████████████████████████ (Pl.'s Opp'n to Def.'s MSJ 18.)  This method "resulted

7    from multiple experiments that were explored over approximately twenty-one months with the use

8    of extensive resources that were devoted by ATS to this project."  (*Id.*)

9           SkinMedica provides the expert report of Rodney Goodson, a former ATS employee who

10   led a team to develop a concentration system between March, 2000, and August, 2002.  (Goodson

11   Decl. ¶ 9, Pl.'s Opp'n to Def.'s MSJ Ex. BB.) ██████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   (*Id.* at ¶ 13.) ██████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ██████████████ (*Id.* at ¶ 12.)

19   (b)  Ownership of the Trade Secrets

20          Histogen aruges that the 2003 APA between SkinMedica and ATS did not grant

21   SkinMedica sufficient rights to sue Histogen for trade secret misappropriation.  SkinMedica

22   disagrees, stating that it acquired through the APA all intellectual property relating to developing,

23   manufacturing, marketing and selling the NouriCel product, and that Histogen's product is a

24   "knock-off" of NouriCel.  (Pl.'s Opp'n to Def.'s MSJ 4.)

25          Under the terms of the APA, SkinMedica acquired the right, title, and interest of ATS and

26   its affiliates to the "Purchased Assets," which includes intellectual property, contracts, books and

27   records, inventory, product data, purchased equipment, and claims.  (*See* APA, Pl.'s Opp'n to

28   Def.'s MSJ Ex. B.)  However, ATS and its affiliates retained all of their right, title and interest to

09cv122

the "Excluded Assets," consisting of "any Intellectual Property which is not directly related to, or

used or held for use in, the Business in any respect." (APA 8-9.)  The APA defines "Business" as

"the activities of developing, manufacturing, marketing and selling Products," where "Products"

refers to "the NouriCel™ product, NouriCel-MD™ product and similar solutions of varying

degrees of potency." (APA 3, 6.)

By stitching together several of these contract terms, it becomes clear that SkinMedica only

acquired rights to the intellectual property "directly related to, or used or held for use in . . . the

activities of developing, manufacturing, marketing and selling the NouriCel product . . . and

similar solutions of varying degrees of potency." Thus, the question before the Court is whether

the three asserted trade secrets fall within that scope.

Histogen's statements that the "legal rights SkinMedica acquired are limited to rights *for*

*making* Nouricel," (Def.'s MSJ 4) (emphasis added) and that SkinMedica may only prevail on its

trade secrets claims if it proves Histogen manufactured NouriCel, are misleading.  A trade secret

could conceivably be "held for use in" the developing, manufacturing, marketing, or selling of a

product and could be misappropriated by a party that never uses it to make that exact product.

Histogen's argument conflates two separate and independent inquiries: the use intellectual

property is held for (only relevant here because of the terms of the APA), and the way in which a

trade secret is allegedly misappropriated. But information may be valuable for more than one

purpose.

In its reply, Histogen addresses its standing argument with regard to the Hair Growth

Product only, stating that NouriCel is a skin product specifically not designed to promote hair

growth, and that as such SkinMedica could not have acquired rights to this claimed trade secret.

(Def.'s Reply ISO MSJ 2-3, ECF No. 283.) It is unclear if Histogen intended to abandon its

standing argument with regard to the Bioreactor Method and the Concentration System.

Regardless, the Court rejects Histogen's standing argument with respect to all three trade

secrets. As described by SkinMedica, all three trade secrets relate at least to the development of

NouriCel, if not also to its manufacture. Determinations of whether or not Histogen actually

produces NouriCel or even to what hypothetical uses NouriCel may be put in the future are

1   irrelevant to the standing inquiry here, which focuses on the purpose of the trade secret as used or

2   held for use by SkinMedica, or possibly ATS—but not the alleged misappropriator.  Thus, there is

3   at least a genuine issue of material fact as to whether SkinMedica acquired rights to the three

4   alleged trade secrets under the APA.

5   (c)  Status as Protectable Trade Secrets

6          In order to constitute a protectable trade secret, the information must: (1) have independent

7   economic value, and (2) have been kept confidential.  *See* Cal. Civ. Code § 3426.1(d); *Religious*

8   *Tech. Ctr. v. Netcom On-line Commc'n Serv., Inc.*, 923 F. Supp. 1231, 1250-51 (N.D. Cal. 1995).

9          (1)  Independent Economic Value

10         A trade secret requires proof of independent economic value derived from not being

11  generally known.  Cal. Civ. Code § 3426.1(d)(1); *see also Yield Dynamics, Inc. v. TEA Sys. Corp.,*

12  154 Cal. App. 4th 547, 561 (2007) (affirming trial court's determination, after a bench trial, that

13  the plaintiff did not have a claim for trade secret misappropriation primarily because it had failed

14  to provide evidence that the trade secret possessed the independent value necessary).  Histogen

15  only challenges the independent economic value of the first alleged trade secret, the Hair Growth

16  Product.

17  ████████████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████ (Def.'s MSJ

19  12.) ███████████████████████████████████████████████████████

20  ███████████████████████████████ (*Id.*)  In support of its motion for summary judgment,

21  Histogen submits the declaration of Gail Naughton, who attests that she learned "in late June 2007,

22  shortly after incorporating Histogen . . . that ███████████████████████████" (Naughton

23  Decl. ¶ 28, Def.'s MSJ Ex. 3.)  As a result, any hair growth product derived from the 2002

24  research "could cause deleterious effects [and] would be highly scrutinized by the [FDA] and only

25  be allowed to move forward in treating a life-threatening /no treatment alternative where the

26  benefit of the treatment greatly outweighs the risk." (*Id.* ¶ 29.)  Dr. Naughton thus believed that

27  Histogen could not commercialize such a product, because ████████████████████████████

28  ████████████████████████████ (*Id.*)  Histogen also provides what it deems

- 18 -

1    "controlling undisputed evidence" ██████████████████, a declaration from Matthew Croughan

2    attesting that, in his expert opinion, the NouriCel conditioned medium lacks value because it

3    contains Wnt5a, ██████████████████████████████. (Def.'s Reply ISO MSJ) (citing

4    Croughan Decl. ¶¶ 32-33.) This fact, coupled with the likelihood that the FDA would not approve

5    any product containing Wnt5a and that, even if it did, safety testing would be "onerous, lengthy,

6    and expensive," apparently renders SkinMedica's asserted trade secret worthless. (*Id.* ¶ 34.)

7         Histogen additionally asserts that the Hair Growth Project's lack of value is demonstrated

8    by ATS's abandonment of the research. (Def.'s MSJ 13.) ████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████ (Naughton Decl. ¶ 15.) ██████████████████

11   ████████████████████████████████████████████████████████████████████████

12   ████████████████████████████ (*Id.* ¶ 16.) According to Histogen, the fact that ATS declared

13   bankruptcy within months of this September, 2002, meeting "further shows that the hair growth

14   project lacked any economic value." (Def.'s MSJ 13.)

15        Histogen has not demonstrated the absence of a genuine issue of material fact as to the Hair

16   Growth Product's economic value. Contrary to Histogen's assertions, the evidence it has

17   presented is hardly uncontested. ████████████████████████████████████████████

18   ██████████████████████████████████████████████ (*See* Pl.'s Opp'n to Def.'s

19   MSJ 10.) Further, scientific discovery may be economically valuable even if initial formulations

20   have undesired characteristics. ████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████ (*Id.* at

26   11.) And the fact that Dr. Naughton attempted to patent the information herself, beginning in

27   2004, casts doubt upon her statement that she believed the information lacked value, even though

28   the PTO rejected those applications. (*See* Def.'s MSJ 11-12.)

1    Thus, there is at least a genuine issue of material fact as to whether the Hair Growth

2    Product has independent economic value.  Because Histogen only addressed the independent

3    economic value of the Hair Growth Method, presumably the Bioreactor Method or Concentration

4    System do have value, at least for the purposes of this motion, and the Court need not address this

5    prong further with regard to those alleged trade secrets.

6        (2) Secrecy

7        Axiomatically, a trade secret must be a secret to merit legal protection.  Generally,

8    information is secret where it is not generally known, and where the owner has taken "efforts that

9    are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d); *see*

10   *also Courtesy Temp. Serv., Inc. v. Leonel Camacho*, 222 Cal. App. 3d 1278, 1288 (1990).

11   Reasonable efforts to maintain secrecy have been held to include "advising employees of the

12   existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and

13   controlling plant access."  *Id.* (citing Legis. Comm. Com., 12 West's Ann. Civ. Code § 108.)  And

14   information which is too generally known to derive value from secrecy is unable to obtain trade

15   secret protection even without disclosure.  *See, e.g.*, *Design Art v. NFL Props., Inc.*, 2000 U.S.

16   Dist. LEXIS 20172 at *10 (S.D. Cal. Nov. 27, 2000) (finding that the idea of a tiger for a logo for

17   the Cincinnati Bengals does not merit trade secret protection because the idea of using the subject

18   of a corporate name as a logo for that entity is generally known).  In California, "information can

19   be a trade secret even though it is readily ascertainable, so long as it has not yet been ascertained

20   by others in the industry."  *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 (1991).  Thus,

21   whether information is secret is "a relative concept and requires a fact-intensive analysis."

22   *Premier Displays & Exhibits v. Cogswell*, 2009 U.S. Dist. LEXIS 119462 at *8 (C.D. Cal. Dec.

23   23, 2009) (citing *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004)).

24       Histogen argues that all three of SkinMedica's alleged trade secrets were not actually

25   secret, because: (1) SkinMedica or ATS failed to take reasonable efforts to maintain their secrecy;

26   and/or (2) the information was generally known, and thus not a protectable secret.

27   //

28   //

(A)  Public Disclosure

Histogen argues that three different public disclosures by ATS each provides an independent basis to defeat the secrecy of the Hair Growth Project: the '494 patent application, and two business meetings held by ATS, one with Merck and one with City of Hope.  Apparently, ATS and Dr. Naughton presented the Hair Growth Project research to Merck in a telephonic business development meeting in June, 2002, without any nondisclosure agreement.  (Def.'s MSJ 9.)  Subsequently, Dr. Naughton sent an electronic copy of the presentation to Merck which was not marked confidential.  (*Id.*)  Dr. Naughton also presented the Hair Growth Project research to scientists and clinicians at City of Hope, a national cancer center.  (*Id.*)  Additionally, in the '494 patent application, Dr. Naughton stated that one use of the conditioned medium from cells cultured in three dimensions was "Stimulation of Hair Growth."  (*Id.* at 10.)  According to Histogen, each of these public disclosures revealed the information that NouriCel contains Wnt factors that promote hair growth.  (*Id.* at 9.)

From the general rule governing secrecy, it follows that an unprotected disclosure of the holder's secret terminates the existence of the trade secret.  *See Stutz Motor Car v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 50 (1992).  Even a single public disclosure of information may defeat trade secret protection.  *See, e.g., HiRel Connectors, Inc. v. United States*, 2006 WL 3618011 at *8-10 (C.D. Cal. Jan. 25, 2006) (finding information was not a protectable trade secret where plaintiff had sent a drawing that disclosed claimed trade secret information to another entity without a non-disclosure agreement).  "The question is whether the information has retained its value *to the creator* in spite any disclosure."  *Premier Displays*, 2009 U.S. Dist. LEXIS 119462 at *8-9 (C.D. Cal. Dec. 23, 2009) (internal quotations and citations omitted) (emphasis in original).

With regard to the '494 patent application, the parties dispute whether it constitutes a disclosure of the Hair Growth Project.  The '494 patent application states that the conditioned media compositions may be fomulated for topical applications using an agent that facilitates penetration of the compound into the skin, for example, DMSO, and applied as a topical application for stimulating hair growth."  ('494 patent, col. 31:8, Ex. A to Naughton Decl.)

- 21 -

1  However, SkinMedica argues that ATS had not done any testing of the use of conditioned media to

2  stimulate hair growth prior to filing the '494 patent, and that the idea was included in the patent

3  application, according to Dr. Naughton, as a "prophetic disclosure." (*See* Pl.'s Opp'n to Def.'s

4  MSJ 7) (citing Naughton Dep. at 115.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7  ▮▮▮▮▮▮▮▮▮▮▮▮, which were not disclosed together in the '494 patent application. (*Id.* at 9.)

8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A trade secret may comprised of partly or entirely non-

12 secret elements and still merit protection. *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc*,

13 420 F. Supp. 2d 1070, 1089-90 (N.D. Cal. 2006); *see also Uniram Tech., Inc. v. Taiwan*

14 *SemiConductor Mfg. Co.*, 617 F. Supp. 2d 938, 942 (N.D. Cal. 2007).  Thus, whether the '494

15 patent publicly disclosed the Hair Growth Project trade secret in the correct combination so as to

16 defeat the secrecy of the information is a triable question of fact.

17      Similarly, questions of fact remain as to whether the Merck and City of Hope meetings

18 were public disclosures.  In her declaration in support of Defendant's motion for summary

19 judgment, Dr. Naughton states: "The presentation was not marked confidential by ATS, and I do

20 not recall any confidentiality agreement with Merck." (Naughton Decl. ¶ 11.)  In her 2009

21 deposition, Dr. Naughton said "I don't remember the Merck presentation having an NDA or

22 CDA." (Naughton Dep. 160.)  The Court agrees with SkinMedica that the duty of weighing the

23 credibility of Dr. Naughton's statements should fall to the jury.  A jury could interpret Dr.

24 Naughton's statements in a number of ways, and could reasonably form either conclusion as to

25 whether the meeting was confidential.  With respect to the City of Hope meeting, the part of the

26 Naughton declaration Histogen points to in support of an absence of non-disclosure agreement

27 there does not actually address whether such an agreement existed, and the Court could not find

28 any affirmative evidence in the record.  Thus, there is a genuine issue of material fact as to

1   whether ATS used reasonable efforts to maintain the secrecy of the Hair Growth Product at the

2   Merck and City of Hope meetings.  And depending on that determination, the issue may also

3   remain whether the trade secret was disclosed in its entirety so as to defeat protection.

4              (B)  Generally Known

5        Histogen also alleges all three trade secrets consist of information generally known and

6   thus not secret.  The Court addresses this argument with regard to each trade secret.

7                   i.  Hair Growth Project

8        According to Histogen, the PTO's rejection of several similar patent applications as

9   obvious in view of the prior art is means the Hair Growth Project was generally known.  (Def.'s

10  MSJ 11-12.) ████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ███████████████████ (*Id.* at 12.)

13       But the determination of secrecy under the UTSA is not the same as the PTO's decision

14  whether an invention is obvious in view of the prior art, and it does not follow as a matter of law

15  that something rejected by the PTO as obvious can never be part of a protectable trade secret.

16  Although they may be highly persuasive, these patent rejections based on prior art are not

17  necessarily determinative of the fact that the claimed trade secret was generally known at the time.

18  *See Celeritas Techs., Ltd. v. Rockwell Intern. Corp.*, 150 F.3d 1354, 1358 (Fed. Cir. 1998) (finding

19  that "reliance on the [patent] prosecution history and the prior art submitted to the PTO is

20  misplaced" in upholding a jury verdict of trade secret misappropriation).  And regardless of

21  whether a patent application is accepted or rejected, a plaintiff may certainly have a viable trade

22  secret claim where the "implementation details and techniques" or other elements of the trade

23  secret go beyond what was disclosed in the patent.  *Id.*  Thus, it remains for the jury to decide the

24  fact-intensive question of whether these patent applications, or the referenced prior art, made the

25  Hair Growth Project—all elements in combination—generally known.

26                  ii.  The Bioreactor Method

27       Intertwining its remaining arguments, Histogen asserts that all eight of the elements of the

28  Bioreactor Method are either generally known, not misappropriated by Histogen, or both.  (Def.'s

1   MSJ 15-19.)  Elements 1-7 are apparently generally known, and elements 2 and 4-8 have not been

2   misappropriated.  The Court addresses the arguments with regard to misappropriation separately

3   below.

4           As to elements 1-7 being generally known, even if taken as true, this fact alone is

5   insufficient to establish the claimed trade secret is not protectable. ▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and none of the references disclose that unique

7   combination of elements together, nor has Histogen argued that the combination is generally

8   known so as to lack value as a trade secret.  (Pl.'s Opp'n to Def.'s MSJ 15-16.)  To the contrary,

9   according to SkinMedica, "the development of the [Bioreactor Method] trade secret required the

10  work of multiple technical professionals at ATS over a period of at least two years."  (*Id.* at 16)

11  (citing Leminh Decl. ¶¶ 14-24.)  Histogen seemingly ignores this "combination" argument, instead

12  focusing on the lack of misappropriation in its reply.

13          However, as indicated above, a trade secret may consist of several elements, each of which

14  is generally known, put together in a novel and previously unknown combination.  *O2 Micro*

15  *Intern. Ltd.*, 420 F. Supp. 2d at 1089-90 (N.D. Cal. 2006) ("Combinations of public information

16  from a variety of different sources when combined in a novel way can be a trade secret.  It does

17  not matter if a portion of the trade secret is generally known, or even that every individual portion

18  of the trade secret is generally known, as long as the combination of all such information is not

19  generally known.")  Thus, establishing that most (or even all) of the elements are generally known

20  does not foreclose the possibility that the eight steps, taken together, constitute a protectable trade

21  secret.

22                          iii.  The Concentration System

23          Histogen addresses the Concentration System only briefly, again providing a chart

24  indicating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and

25  that others were not misappropriated.  (Def.'s MSJ 20.)  However, as with the Concentration

26  System, Histogen has not established that the trade secret is generally known in its entirety—▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮.  SkinMedica states the development of this Concentration System

28  "resulted from multiple experiments that were explored over approximately twenty-one months

- 24 -

with the use of extensive resources that were devoted by ATS to this project." (Pl.'s Opp'n to Def.'s MSJ 18.)  As above, a jury could determine that the efforts of ATS or SkinMedica converted some bits of generally known knowledge into a process that derives value from not being generally known.

(d) Misappropriation

The final element of SkinMedica's trade secret claim is whether the protected information was misappropriated by Histogen.  As defined above, a "misappropriation" requires the disclosure or use of a trade secret without consent by a person who knew or should have known that his or her knowledge of the trade secret was: (1) derived from or through a person who had utilized improper means to acquire it; (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.  Cal. Civ. Code § 3246.1(b)(2); *see also Wyatt Tech. Corp. v. Malvern Inst. Inc.*, 2009 WL 2365647 at *16-17 (C.D. Cal. July 29, 2009).

First, Histogen asserts vaguely that it cannot be held liable because the trade secrets were "readily ascertainable based upon the same proof showing that the information was generally known." (*Id.* at 13, 15-19, 20.)  The Court interprets Histogen's argument as a defense to the intent element of misappropriation.  *See O2 Micro*, 420 F. Supp. 2d at 1091 (noting that "misappropriation of trade secrets is an intentional tort").  Under California law, "the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation."  *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 899 (2003) (citing Legis. Comm. Com., 12A pt. 1 West's Ann. Civ. Code § 3426.1).  Discussing information made readily ascertainable by a third-party internet posting, the court in *DVD Copy Control* clarified that "a trade secret is [not] automatically lost any time it is [published]," such as when the plaintiff can show the information remained secret.  *Id.* at 901.  Based on the evidence Histogen has provided, the Court cannot determine that any of the alleged trade secrets were readily ascertainable, nor that, even if they were, this would operate to bar liability here.  It must be left to the jury to conclude whether Histogen obtained SkinMedica's protected trade secret information by proper means because that information was readily ascertainable.

- 25 -

09cv122

With regard to the Bioreactor Method trade secret, Histogen additionally argues that its actions cannot constitute misappropriation because it only grows cells in monolayer and on microcarrier beads, not in three-dimensions. (Def.'s MSJ 15.)  Although the Court's previous Order in this case pertaining to patent noninfringement found that Histogen does not culture cells in three-dimensions as claimed in the patents-in-suit, these patent limitations are not imported to SkinMedica's trade secrets claims.  (*See* Nov. 21, 2011 MSJ Order 12-14, ECF No. 228.)  Indeed, during its discussion of patent infringement, the Court noted that Histogen *does culture* in three-dimensions, using beads, but that the patents-in-suit specifically exclude culturing using beads. The Bioreactor Method trade secret is not the same as the patents-in-suit; if it were, trade secret protection would be extinguished. *See Aqua-Lung America, Inc. v. American Underwater Prods., Inc.*, 709 F. Supp. 2d 773, 787-88 (N.D. Cal. 2010) ("A trade secret cannot possibly be patented. This claim is a separate one, just as a suit for appropriation of literary property is separate from a suit under the copyright laws.") (citations omitted).  Thus, the Court rejects the argument that the Court's claim construction and noninfringement ruling preclude Histogen from having misappropriated the Bioreactor Method trade secret as a matter of law.

Lastly, as mentioned above, Histogen argues it has not misappropriated the Bioreactor Method or Concentration System trade secrets because it does not use several of the claimed elements. (MSJ 15-19, 20.)  However, this argument misunderstands the law on this point.  In the context of trade secret misappropriation, information may be improperly "used" in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived. *See, e.g.*, *Speech Tech. Assocs. v. Adaptive Commc'n Sys.*, 1994 WL 449032 at *10 (N.D. Cal. Aug. 16, 1994) (finding misappropriation where some of the technology used in the offending new products was different from that claimed in the trade secret, but most of the functional aspects of the trade secret technology were incorporated) (citing *American Can Co. v. Mansukhani*, 742 F.2d 314, 328-29 (7th Cir. 1984) ("[A] party may not use another's trade secret even with independent improvements or modifications so long as the product or process is substantially derived from the trade secret.")) Accordingly, this scattershot attempt to disclaim use of various elements of the claimed trade secrets does not foreclose the possibility that Histogen's process was not

09cv122

1   substantially derived from the claimed trade secrets, even if it differed in specifics from the

2   process described therein.

3   (e)  Reasonable Royalty

4        Histogen also argues that a reasonable royalty, the only monetary remedy SkinMedica

5   seeks for its trade secret claim, is unavailable as a matter of law under Cal. Civ. Code § 3426.3

6   because SkinMedica cannot establish that damages or unjust enrichment are not provable.  (Def.'s

7   MSJ 23.)  SkinMedica does not contest that the applicable California law permits reasonable

8   royalty damages only if actual damages or unjust enrichment are not provable in trade secret

9   actions.  (Pl.'s Opp'n to Def.'s MSJ 22-25); *see also Cacique, Inc. v. Robert Reiser & Co., Inc.*,

10   169 F.3d 619, 623 (9th Cir. 1999) (explaining that California law differs on this point from both

11   the UTSA and patent law, neither of which requires alternative methods of damages to be

12   unprovable before courts may impose a reasonable royalty).  Instead, SkinMedica challenges the

13   sufficiency of Histogen's evidence and asserts its own arguments as to why actual damages and

14   unjust enrichment are unprovable.  (*Id.*)

15        Based on the parties' contradicting evidence and broadly sweeping unsupported assertions,

16   the Court cannot determine what measure of damages are provable.  Histogen's arguments that

17   actual damages are provable "by analyzing SkinMedica's lost sales and profits resulting from

18   Histogen's sales of ReGenica products" and that SkinMedica's unjust enrichment is provable "by

19   analyzing Histogen's costs to independently develop or acquire the alleged trade secret

20   information" fail to convince.  (*Id.* at 23-24.)  Merely stating what damages are doesn't make them

21   provable given the specific facts of the case.

22        Further, the Court cannot conclusively reject SkinMedica's arguments that no evidence is

23   available as to lost profits where the products are used for hair growth rather than skincare because

24   neither party has yet sold any such hair growth product, and that any apportionment of loss is

25   speculative based on the multi-player market and other factors specific to this case.  (Pl.'s Opp'n

26   to Def.'s MSJ 22-25.)  Indeed, such "unusual circumstances" may render unjust enrichment

27   unprovable. *Cacique*, 169 F.3d at 623; *see also 02 Micro*, 399 F. Supp. 2d at 1077 (awarding

28   reasonable royalties where expert evidence left the jury to rely on "speculation and guesswork");

*Unilogic v. Burroughs*, 10 Cal. App. 4th 612, 626-630 (1992) (infringing product never brought to market). Thus, the Court finds it improper to summarily adjudicate the issue of damages based on the evidence before it. The parties may revisit this issue in their pretrial motions.

(f) Conclusion

For the foregoing reasons, numerous genuine issues of material fact remain as to SkinMedica's trade secrets claims. Consequently, Histogen's motion for summary judgment of SkinMedica's trade secret claims is **DENIED**.

*(ii) Constructive Trust*

According to Histogen, SkinMedica premises its claim for constructive trust on its claim for alleged misappropriation of the Hair Growth Project trade secret. (Def.'s MSJ 22.) Thus, Histogen argues that SkinMedica's constructive trust claim must fail because its trade secret claim fails. (*Id.*) Given the Court's determination that summary judgment is unwarranted as to the Hair Growth Product trade secret claim, it follows that the Court should reject the motion as to the constructive trust claim as well, under Histogen's own reasoning. Accordingly, Histogen's motion for summary judgment of SkinMedica's constructive trust claim is **DENIED**.

*(iii) Breach of Contract*

Histogen argues that SkinMedica's breach of contract claim fails as a matter of law for two reasons: (1) because Dr. Naughton's confidentiality obligations ended before the alleged breach occurred, and (2) because the statute of limitations has run.

According to Histogen, Dr. Naughton only entered into two written agreements with ATS that included confidentiality agreements. (Def.'s MSJ 21.) The first was an employment agreement between Dr. Naughton and Marrow-Tech Incorporated, the predecessor company to ATS, dated December 9, 1987. ("First Employment Agreement," Naughton Decl. Ex. 7.) The second was also an employment agreement between Dr. Naughton and Marrow-Tech Incorporated, dated June 16, 1989. ("Second Employment Agreement," Naughton Decl. Ex. 8.) The Second Employment Agreement expressly superseded the First Employment Agreement in its entirety. (Def.'s MSJ 21; Naughton Decl. Ex. 8 ¶ 20.) Although a draft of a new employment agreement was created, Histogen claims the terms were never finalized. (Def.'s MSJ 21.)

1    Under the terms of the Second Employment Agreement, Dr. Naughton was obligated to a
2    three-year period of confidentiality after the termination of the agreement, which had a six-year
3    term. (Def.'s MSJ 21.)  Thus, Histogen calculates that Dr. Naughton's employment agreement
4    with ATS terminated on June 16, 1995, and any confidentiality obligation she had under the
5    Second Employment Agreement ended by at least June 16, 1998. (*Id.*)  Histogen does not dispute
6    that SkinMedica may enforce any agreements between Naughton and ATS relating to the Nouricel
7    product under the APA.

8    Instead, Histogen claims that the earliest events alleged by SkinMedica as giving rise to its
9    breach of contract claim did not occur until 2002, at which time she was no longer bound by any
10   contractual confidentiality obligation to ATS. (*Id.* at 22.)  This argument was considered by Judge
11   Whelan in his March 29, 2010 Order denying Defendant's motion for summary judgment as to
12   SkinMedica's breach of contract claim. (March 29, 2010 Order 8-10, ECF No. 117.)  Judge
13   Whelan found that a genuine issue of material fact existed as to whether Dr. Naughton had also
14   signed a Proprietary Agreement while she was employed at ATS, and whether any breaches of
15   confidentiality occurred during the contractual period governed by the Second Employment
16   Agreement. (*Id.*)  SkinMedica has provided three "representative" copies of ATS Proprietary
17   Agreements, signed by former ATS employees, and alleges that ATS had a formal policy requiring
18   all of its employees to sign these agreements. (*See* March 29, 2010 Order 9; Gergen Decl. ¶ 3,
19   ECF No. 66.)  Judge Whelan found that, although SkinMedica has not provided a Proprietary
20   Agreement signed by Dr. Naughton, SkinMedica's allegations were sufficient to create a genuine
21   issue of material fact as to whether she actually signed one. (*Id.*)  And, "[w]ithout further
22   explanation from the parties, the Court can not assume that the alleged breach did not occur based
23   upon information acquired about NouriCel during those time periods." (*Id.* at 10.)  The Court
24   agrees with Judge Whelan's determination that a genuine issue of material fact remains as to the
25   extent of Dr. Naughton's contractual obligations and the timing and extent of any breach of
26   confidentiality.

27   Histogen also argues that SkinMedica's breach of contract claim must fail because it is
28   barred by the applicable four-year statute of limitations under California Code of Civil Procedure

09cv122

1    section 337(1).  (*Id.*)  SkinMedica counters that California law states the statute of limitations for

2    breach of contract begins to fun from the date the breach was discovered or could have been

3    discovered with reasonable diligence, not from the date of the breach itself, citing *Gryczman v.*

4    *4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 5-6 (2003) (articulating the "delayed discovery

5    rule" for breaches of contract which are committed in secret, which states the statute shall run

6    from the date of discovery where plaintiff exercised due diligence in discovering the breach).

7    "Because Dr. Naughton's misappropriation was surreptitious, SkinMedica could not and did not

8    discover her breach of contract until the patent applications she filed covering the stolen Hair

9    Growth Trade Secrets were published."  (Pl.'s Opp'n to Def.'s MSJ 21; Naughton Nov. 11, 2009

10   Dep.)  According to SkinMedica, because the earliest of those patent applications was filed in

11   2006, SkinMedica's breach of contract claim which it asserted in 2009 is not barred by the four-

12   year statute of limitations. (*Id.*)  In its reply, Histogen does not respond to these arguments, and the

13   Court finds them sufficient to establish at least a genuine issue of material fact as to whether

14   SkinMedica could have discovered the alleged breach prior to the allowed statutory period.

15   Accordingly, the Court Histogen's motion for summary judgment of SkinMedica's breach of

16   contract claim is **DENIED**.

17   **2. SkinMedica's Motion for Final Judgment under Rule 54(b)**

18        SkinMedica also moves for entry of final judgment.  (FJ Motion, ECF No. 237.)  Arguing

19   that the parties' remaining state law claims are severable from SkinMedica's patent claims, which

20   the Court's summary judgment ruling on noninfringement fully adjudicated, SkinMedica requests

21   final judgment so that it may immediately pursue an appeal of its patent claims.  (*Id.* at 1.)

22   Histogen opposes, arguing that the remaining state law claims are factually intertwined with the

23   patent issues, leading to multiple appeals on the same issues and rendering entry of final judgment

24   at cross-purposes with judicial economy.  (Def.'s Opp'n to FJ Motion, ECF No. 245.)

25   *A.  Legal Standard*

26        In order to hear an appeal of a ruling from this Court under the patent statue, the Federal

27   Circuit must determine if the appeal is of a final judgment or whether there is some other basis for

28   jurisdiction over an interlocutory order.  *Nystrom v. TREX Co.*, 339 F.3d 1347, 1350 (Fed. Cir.

1  2003); *see also* 28 U.S.C. § 1295.  On matters relating to its jurisdiction, the Federal Circuit

2  applies its own law, not that of the regional circuit from which the case arose.  *Nystrom*, 339 F.3d

3  at 1350; *State Contracting & Eng'g Corp. v. State of Florida*, 258 F.3d 1329, 1334-35 (Fed. Cir.

4  2001).  Although interlocutory appeal of claim construction orders or orders granting summary

5  judgment of non-infringement is often desired by one or both parties in the patent context for

6  strategic or other reasons, "piecemeal litigation is as strictly precluded by the rule of finality for

7  patent cases as it is for any other case."  *Nystrom*, 339 F.3d at 1350.

8         However, in such a situation, a district court may consider whether there is a proper basis

9  to direct the entry of final judgment on fewer than all of the claims under Federal Rule of Civil

10  Procedure 54(b).  *Id.*  In order to do so, the court must make two determinations.  First, it must

11  determine whether the judgment is final in the sense that it is an "ultimate disposition of an

12  individual claim entered in the course of a multiple claims action."  *Ultra-Precision Mfg.*, 338

13  F.3d 1353, 1357 (Fed. Cir. 2003) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435

14  (1956)).  Second, the court must determine "whether any just reason for delay exists."  *Curtiss-

15  Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7 (1980); *see also* Fed. R. Civ. P. 54(b).  Factors

16  relevant to this decision include "whether the claims under review were separable from the others

17  remaining to be adjudicated and whether the nature of the claims already determined was such that

18  no appellate court would have to decide the same issues more than once even if there were

19  subsequent appeals."  *Curtiss-Wright*, 446 U.S. at 8.

20  **B.  *Efficient Resolution of this Case***

21         The mere fact that claims share common facts does not preclude the entry of partial final

22  judgment as to one or more of those claims.  In *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 699

23  (Fed. Cir. 2001), the Federal Circuit affirmed the district court's entry of final judgment as to

24  antitrust laws under Rule 54(b) when related contract and tort claims remained for trial, stating

25  that "[e]ven for claims that arise out of the same transaction or occurrence, sound case

26  management may warrant entry of partial final judgment."

27         In the context of patent litigation in particular, many courts have entered partial final

28  judgment as to some or all patent law issues in order to permit appeal to the Federal Circuit where

distinct legal issues remained, even where factually related. *See, e.g.*, *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1356 (Fed. Cir. 2006) (noting district court's entry of final judgment as to all patent-related claims where state law trade secrets, conversion, and unjust enrichment claims remained); *W.L. Gore*, 975 F.2d 858, 861 (Fed Cir. 1992) (affirming district court's entry of final judgment as to infringement where patent misuse and antitrust claims remained); *The Laryngeal Mask Co. Ltd. v. Ambu*, 2009 U.S. Dist. LEXIS 129822 (S.D. Cal. Sept. 25, 2009) (court entered final judgment as to all patent-related claims under 54(b) where state law claims remained).

Based on the above-cited cases, it would likely be within the Court's discretion to enter partial final judgment of noninfringement here. However, ultimately the Court finds based on the circumstances of this case that sound case management does not warrant doing so. For one, SkinMedica has not presented any compelling reason to incite piecemeal appeals of this case down the road. The trial is set to commence in six months, at which point it is very unlikely the Federal Circuit will have heard any appeal of the Court's prior summary judgment ruling. Histogen points out that an earlier date was available for trial, and that SkinMedica rejected the date. Instead, it seeks to "expedite" the resolution of this case by separately appealing the Court's prior noninfringement ruling. However, introducing the potential for two separate appeals and two separate trials, or for one party to request a stay of the remaining state law claims, would more likely cause further delay of these proceedings which have already encountered too much delay. Many issues remain to be tried, and, in all likelihood, appealed. Thus, immediate appeal will not aid the efficient resolution of this entire case. The Court accordingly **DENIES** SkinMedica's motion for final judgment as to noninfringement.

**3. Histogen's Motion for Attorneys' Fees**

Finally, Histogen also seeks an order requiring SkinMedica to pay its reasonable attorneys' fees, costs, and expenses incurred in defending SkinMedica's "blatantly meritless" patent infringement claims. (Fees Motion 1, ECF No. 287.) According to Histogen, SkinMedica deliberately advanced specious positions in pursuing a patent infringement action against Histogen for the improper purpose of harming its competitor. (*Id.*) Histogen summarizes this allegedly sanctionable conduct as follows: (1) SkinMedica's legally unsound claim construction tactics;

1   (2) SkinMedica's presentation of evidence at claim construction that contradicted the patent

2   specifications; (3) SkinMedica's "refusal to back down" after the adverse Markman Order; and

3   (4) SkinMedica's decision to contest Histogen's motion for summary judgment "which

4   unnecessarily extended the duration of the meritless patent lawsuit by many months and caused the

5   accumulation of further unnecessary attorneys fees for Histogen." (*Id.*)

6        Histogen argues that the award of attorneys' fees at this point is justified under three

7   theories.  First, under 35 U.S.C. § 285, the Court may award reasonable attorneys' fees to the

8   prevailing party "in exceptional cases."  Courts have found cases exceptional and awarded such

9   fees where the plaintiff "pursued objectively baseless infringement claims."  *See Eon-Net LP v.*

10   *Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011).  Second, 28 U.S.C. § 1927 provides:

11   "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously

12   may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees

13   reasonably incurred because of such conduct."  Third, Histogen argues the Court may award

14   attorneys' fees "based on the conduct of the parties and their counsel under the court's inherent

15   authority."  (Fees Motion 16-17.)  A party's "bad faith" or recklessness may support such an

16   award of attorneys' fees as a sanction.  *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991).

17        The Court declines to award attorneys' fees on any of these bases at this time.  Histogen

18   points to the Court's Order granting summary judgment of noninfringement as proof that

19   SkinMedica's opposition was "objectively baseless" and "legally unsound."  In that Order, the

20   Court stated that "SkinMedica's premise is contrary to the patent history and contrary to the

21   Court's claim construction analysis."  (ECF No. 228.)  However, nothing about this language, or

22   anything else stated in that Order, leads to the conclusion advanced by Histogen that this case is

23   exceptional, that SkinMedica's infringement claims were objectively baseless, or that SkinMedica

24   has multiplied the proceedings unreasonably and vexatiously.  Contrary to Histogen's assertions,

25   there is no evidence of egregious litigation misconduct.  Histogen also fails to establish why the

26   award of fees is necessary now, in the middle of this ongoing litigation.  Accordingly, Histogen's

27   motion for attorneys' fees, costs, and expenses incurred in defending against SkinMedica's patent

28   infringement claims is **DENIED** without prejudice.

09cv122

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** SkinMedica's motion for partial summary judgment of Histogen's statutory unfair competition claim as to nonrestitutionary disgorgement and for summary judgment of Histogen's common law unfair competition claim.  In addition, the Court **DENIES** Histogen's motion for summary judgment, SkinMedica's motion for final judgment and Histogen's motion for attorneys' fees.

**IT IS FURTHER ORDERED** that the Clerk shall file this Order provisionally under seal. Portions of the motion hearing in this matter were sealed by agreement of the parties, and many of the documents filed by both parties in support of these motions have been filed under seal (for counsel only) pursuant to the Protective Order in this case  (ECF No. 27).  Counsel may confer and submit one joint statement clearly indicating any portions of the Order they seek to have redacted by April 20, 2012.  The Court will consider any such requests and shall thereafter file the Order publicly, with any necessary redactions, on the docket.

DATED:  April 4, 2012

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge

Copy only:   Counsel for Plaintiff/counterdefendant SkinMedica
Counsel for Defendants/counterclaimants Histogen and Gail K. Naughton
(*See* Protective Order ¶ 3, ECF No. 27.)